## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

REBECCA A. BRUNOTTE,     )
   **Plaintiff,**     )
       )  **Civil Action No.  08-0587 (FJS)**
**V.**      )
       )  **ECF**
DANIEL M. TANGHERLINI,     )
**Acting Administrator, General Services**  )
**Administration,**     )
   **Defendant.**     )
_____ )

### PLAINTIFF'S OPPOSITION TO
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Rebecca Brunotte, by her undersigned attorneys and pursuant to Fed.R.Civ.P. 56, respectfully requests that the Court deny Defendant's motion for summary judgment in the above-captioned matter.  In the alternative, Plaintiff pursuant to Fed.R.Civ.P. 56(d) respectfully requests that the Court deny Defendant's motion for summary judgment and/or defer consideration of Defendant's motion for summary judgment on the grounds that expert witness discovery in the above-captioned matter is incomplete, denying Plaintiff access to facts essential to justify her opposition to Defendant's motion for summary judgment.  Material facts in dispute are set forth in the accompanying Statement of Disputed Material Facts and Genuine Issues. Argument in support of the Plaintiff's Opposition to Defendant's Motion for Summary Judgment is discussed in the accompanying memorandum of points and authorities.

WHEREFORE, for the foregoing reasons, which constitute good cause, the Court should deny Defendant's motion for summary judgment, or in the alternative should defer consideration of Defendant's motion for summary judgment.  Proposed Orders are attached for the Court's convenience.

Respectfully submitted,

/s/ Joseph V. Kaplan

_____

JOSEPH V. KAPLAN
D.C. BAR # 347344
ANDREW J. PERLMUTTER
D.C. BAR # 489601
PASSMAN & KAPLAN, P.C.
1828 L Street NW, Suite 600
Washington, D.C. 20036
(202) 789-0100

Attorneys for the Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that, on this 16th day of April, 2012, I caused a copy of Plaintiff's Opposition to

Defendant's Motion for Summary Judgment (with Memorandum of Points and Authorities,

Statement of Disputed Material Facts and Genuine Issues, associated exhibits not under seal due

to the Stipulated Privacy Protection Order in this matter, and proposed Orders) to be served by

ECF, and a copy of the associated exhibits which are under seal due to the Stipulated Privacy

Protection Order in this matter to be served by courier hand delivery, upon the following counsel

for Defendant:

Heather Graham-Oliver, Esq.
Assistant United States Attorney
Judiciary Center Building
555 4th St. NW
Civil Division-Suite 4410
Washington, DC 20530

/s/ Joseph V. Kaplan

_____

Andrew J. Perlmutter

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                          )
**REBECCA A. BRUNOTTE,**     )
         **Plaintiff,**      )
                          )     **Civil Action No.  08-0587 (FJS)**
    **V.**                 )
                          )     **ECF**
**DANIEL M. TANGHERLINI,**     )
**Acting Administrator, General Services**  )
**Administration,**           )
         **Defendant.**     )
_____  )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.**     **Standard for Summary Judgment**

    A moving party in summary judgment must show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56 (c). "To determine which facts are 'material', a court must look to the substantive law upon which each claim rests.  A 'genuine issue' is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action."  *Freeman v. Environmental Protection Agency,* Civ. Action No. 02-0387, 2004 WL 2451409 (D.D.C. Oct. 25, 2004) (Urbina, J.) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).  Where testimonies differ as to a material fact, the court should not engage in a "trial by affidavits" at the summary judgment phase, but must wait for trial to weigh the evidence and draw legitimate inferences from the facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  The D.C. Circuit has interpreted *Anderson* as only permitting summary judgment where the issues are so one-sided as to justify a decision as a matter of law.  *See Waters v. Thornburgh,* 888 F.2d 870, 877 (D.C.Cir. 1989).

In summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all inferences in that party's favor. *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Masson v. New Yorker Magazine*, 501 U.S. 496, 520 (1991); *Dunaway v. International Broth. of Teamsters*, 310 F.3d 758, 761 (D.C. Cir. 2002). "When considering a summary judgment motion, 'the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Chang v. Dept. of the Navy,* 314 F.Supp.2d 35, 39 (D.D.C. 2004) (Friedman, J.). The court "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves*, 530 U.S. at 151. "'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge' ruling on a motion for summary judgment." *George v. Leavitt*, 407 F.3d 405, 410 (D.C. Cir. 2005)(quoting *Anderson*, 477 U.S. at 255). Whether a defendant's statements are worthy of credibility is a genuine issue of material fact is reserved for trial. *Mastro v. Potomac Electric Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006). The Supreme Court teaches that, when assessing the intent behind a decision of a governmental entity, "motivation is itself a factual question." *See Hunt v. Cromartie,* 526 U.S. 541, 549 (1999) (racial gerrymandering case).

**II.    Summary Judgment for GSA Should Be Denied On Ms. Brunotte's First Claim**

**a.   Privacy Act Cause of Action for Wrongful Disclosure of Records**

"The Privacy Act regulates the collection, maintenance, use, and dissemination of an individual's personal information by federal government agencies. Each federal agency that maintains records in a system of records must adhere to the requirements set forth by the Act. Agencies are generally prohibited from disclosing any information contained in their records without consent from the individual about whom the information pertains." *Radack v. Dept. of*

*Justice,* 402 F.Supp.2d 99, 104-05 (D.D.C. 2005) (Kennedy, J.) (internal citations omitted); *accord Doe v. Dept. of Justice,* 660 F.Supp.2d 31, 41 (D.D.C. 2009) (Huvelle, J.). The elements of the Privacy Act claim unlawful disclosure of records are: "'[A] plaintiff must show that (1) the disclosed information is a 'record' contained within a 'system of records'; (2) the agency improperly disclosed the information; (3) the disclosure was willful or intentional; and (4) the disclosure adversely affected the plaintiff .' […] In addition, an unlawful disclosure claim also requires a showing of "actual damages" as a result of some harm resulting from the disclosure." *See Feldman v. Cent. Intelligence Agency,* 797 F.Supp.2d 29, 38, (D.D.C. 2011) (Howell, J.)*; accord Doe,* 660 F.Supp.2d at 51.

### b. The EEO Counselor's Notes of Ms. Brunotte's Interview is a 'Record' Contained Within the EEOC/GOVT-1 'System of Records'

Defendant, in its motion for summary judgment, does not argue that that the EEO Counselor's notes from her interview of Ms. Brunotte are not a record within a system of records governed by the Privacy Act, and so Plaintiff submits that it is undisputed that the disclosed information was a 'record' contained within a Privacy Act 'system of records', thus establishing the first element of Plaintiff's unlawful disclosure cause of action. The notes from the EEO Counselor's interview of Ms. Brunotte in connection with her then-informal EEO complaint constituted documents compiled during the pre-complaint counseling for Ms. Brunotte's sex discrimination complaint. *See* Statement of Relevant Undisputed Material Facts ("Statement") at ¶¶ 1-2. The EEOC/GOVT-1 system of records contains "documents compiled during the pre-complaint counseling and the investigation of complaints filed under section 717 of Title VII...." *See* 67 Fed.Reg. 49,354-49,355 (July 30, 2002). Ms. Savage's notes of her interview of Ms. Brunotte meet this definition, and thus fall within the scope of the EEOC/GOVT-1 system of records. *See id.*; Statement at ¶¶ 1-2. The fact that the records were compiled and held by GSA

3

rather than the EEOC is of no legal moment, as the EEOC/GOVT-1 system of records extends to records held by other agencies such as Defendant.  *See* 67 Fed.Reg. at 49,354; 29 C.F.R. § 1611.1.   Ms. Savage (a contractor), as EEO Counselor, is treated as a GSA employee.  *See Ciralsky v. Cent. Intelligence Agency,* 689 F.Supp.2d 141, 155 (D.D.C. 2010) (Shanstrom, S.J.).

### c. Defendant Improperly Disclosed the EEO Counselor's Notes of Ms. Brunotte's Interview by the EEO Counselor

Under the Privacy Act, "[n]o agency shall disclose any record which is contained in a system of records by any means of communication to any person, or to another agency, except pursuant to a written request by, or with the prior written consent of, the individual to whom the record pertains, unless disclosure of the record" meets one of twelve specified exceptions.  *See* 5 U.S.C. § 552a(b).  The disclosure by Ms. Coleman to Mr. Drugley, Mr. Geist, Ms. Lane and Mr. Bolster was not made pursuant to any request by, or with the prior written consent of, Ms. Brunotte.  *See* Statement at ¶ 8.   Therefore, unless one of the twelve exceptions applies, Ms. Coleman's disclosure was in violation of the Privacy Act.  Even a cursory examination of the evidence of record shows that most of the exceptions clearly do not apply to this disclosure. *See* Memorandum of Points and Authorities in Support of Plaintiff's Motion for Partial Summary Judgment in the above-captioned matter ("Plaintiff's Memorandum") at 6 fn.4, restated and incorporated herein by reference for purposes of brevity.

The exception under 5 U.S.C. § 552a(b)(1) restricts disclosures to individuals who have a need to know the information in connection with their specific job duties.  *See* 5 U.S.C. § 552a(b)(1).  The Office of Management and Budget (OMB) has statutory authority to promulgate authoritative guidance and regulations for the Privacy Act.  *See* 5 U.S.C. § 552a(v)(1).  OMB's guidance and regulations explain that 5 U.S.C. § 552a(b)(1) "is based on a 'need to know' concept. […] Minimally, the recipient officer or employee must have an official 'need to know.'

4

The language would also seem to imply that the use should be generally related to the purpose for which the record is maintained."   40 Fed.Reg. 28,954 (July 9, 1975); *but see Doe,* 660 F.Supp.2d at 45.   The courts construe 5 U.S.C. § 552a(b)(1) by looking to the specific scope of duties of the disclosure recipient or that recipient's immediate agency component.   *See, e.g., Coburn v. Potter,* 329 Fed.Appx. 644, 646 (7th Cir. 2009); *Ciralsky,* 689 F.Supp.2d at 155; *Thompson v. Dept. of State,* 400 F.Supp.2d 1, 20-21, 21 fn.28 (D.D.C. 2005) (Huvelle, J.). Disclosures from an EEO case file can be made to assist in the investigation of a complaint, to individuals whose duties make it appropriate for them to conduct such investigations, such as personlists or agency counsel.   *See Howard v. Marsh,* 785 F.2d 645, 648 (8th Cir. 1986), *cert. denied,* 107 S.Ct. 581 (1986); *cf. Boyd v. Snow,* 335 F.Supp.2d 28, 38 (D.D.C. 2004) (Collyer, J.).   The courts look askance at agencies invoking a "need to know" routine use when the documents are shown in full text, and not redacted to only disclose the discrete portions of the documents which directly reference the disclosure recipient.   *Cf. Boyd,* 335 F.Supp.2d at 38-39.

In this case, the "need to know" exception would not authorize disclosures to Ms. Lane, Mr. Geist, Mr. Drugley and Mr. Bolster.   Mr. Bolster (Ms. Coleman's husband) did not work for GSA, and so would not qualify under the 5 U.S.C. § 552a(b)(1) exception as he was not an 'officer and employee of the agency'. *See* Statement at ¶ 14.   The GSA component in which Mr. Geist, Mr. Drugley and Ms. Lane all worked was the Office of the Chief Information Officer (OCIO), whose tasks related generally to information technology (IT) and telephony issues.   *See id.* at ¶ 15.   Therefore, the office's duty portfolio did not include the kind of EEO, legal or human resources duties which would normally suit them to conduct investigations of EEO complaints such as Plaintiff's.   At the time of the December 2005 disclosures, Mr. Geist and Mr. Drugley were IT managers; Ms. Lane was a secretary. *See id*.   Thus, Mr. Geist, Mr. Drugley and Ms.

Lane were not personnelists, EEO specialists or agency attorneys—the ordinary appropriate duty-related recipients of disclosures of documents from an active EEO investigation. *See, e.g., Howard,* 785 F.2d at 648; *Ciralsky,* 689 F.Supp.2d at 154-55; *Thompson,* 400 F.Supp.2d 1, 20-21, 21 fn.28; Statement at ¶¶ 4, 5, 15.   A "need to know" argument is further undercut by the fact that Ms. Coleman sent the full text of Ms. Brunotte's EEO allegations to all recipients, as opposed to sending excerpts covering just the parts of the EEO claims in which the recipient was personally involved or about which the recipient had personal knowledge. *See* Statement at ¶¶ 17-19.  Therefore, the "need to know" exception would not apply.

The 5 U.S.C. § 552a(b)(3) "routine use" exception allows documents in a system of records to be disclosed for those 'routine uses' published in a system of records notice in the Federal Register.  *See* 5 U.S.C. §§ 552a(b)(3); 552a(e)(4)(D).  "The government must therefore demonstrate both 'compatibility' and publication in the Federal Register in order to successfully invoke the routine use exception." *See Radack,* 402 F.Supp.2d at 104-05.  The EEOC/GOVT-1 system of records in force at the time of Ms. Coleman's disclosure in December 2005 specifies nine routine uses.  *See* 67 Fed. Reg. at 49354 (July 30, 2002).  A cursory examination shows that most of these routine uses clearly do not apply to this matter. *See* Plaintiff's Memorandum at 8 fn.5, restated and incorporated herein by reference for purposes of brevity.   The remaining routine uses, while not ultimately applicable, bear more examination.  Routine uses "d-e" and "h-i" in the EEOC/GOVT-1 system of records notice are:

> d. To disclose to an authorized equal employment opportunity investigator, arbitrator or other duly authorized appeal grievance examiner, formal complaints examiner, administrative judge, official engaged in investigation or settlement of a grievance, complaint or appeal filed by an employee.
> e. To disclose, in response to a request for discovery or for appearance of a witness, information that is relevant to the subject matter involved in a pending judicial or administrative proceeding. […]

h. To disclose information to employees of contractors engaged by an agency to carry out the agency's responsibilities under 29 CFR part 1614.
i. To disclose information to potential witnesses as appropriate and necessary to perform the agency's functions under 29 CFR part 1614.

*See* 67 Fed. Reg. at 49354 (July 30, 2002).   At the time of Ms. Coleman's December 2005 disclosure, Plaintiff's EEO complaint was in the informal or pre-complaint stage.  *See* Statement at ¶ 1-2.   Therefore, there was no formal proceeding which could give rise to a 'request for discovery or for appearance of a witness' which would permit disclosures under routine use "e." EEO counselor Joy Savage was not the recipient of the December 2005 disclosures by Ms. Coleman, and so Ms. Coleman's disclosure of Ms. Savage's notes of her interview of Plaintiff to anyone other than Ms. Savage herself falls outside the scope of routine use "h".  *See* Statement at ¶ 1-2, 4-5, 7.   Mr. Bolster, Mr. Drugley, Ms. Lane and Mr. Geist were also not Responding Management Officials (RMOs) in Ms. Brunotte's EEO complaint.  *See* Statement at ¶¶ 3, 50.  As they were neither RMOs nor the EEO Counselor, none of those four individuals can plausibly be an 'official' involved in settlement or in conducting the investigation of Ms. Brunotte's EEO complaint.  As Ms. Brunotte's EEO complaint was at the informal stage, no "arbitrator or other duly authorized appeal grievance examiner, formal complaints examiner [or] administrative judge" was assigned to the case.  Accordingly, routine use "d" does not apply.

Disclosure of EEO records in proceedings under 29 CFR part 1614 is interpreted in light of EEOC policy and regulations.  *See Howard,* 785 F.2d at 647-49.  Under *Auer v. Robbins,* 519 U.S. 452 (1997), the courts defer to an agency's interpretation of its own regulations.  *See, e.g., Talk America, Inc. v. Michigan Bell Telephone Co. dba AT&T Michigan,* 131 S.Ct. 2254, 2260-61 (2011).  The EEOC promulgated 29 C.F.R. part 1614, and so its interpretive announcements are entitled to *Auer* deference.  The courts of this Circuit have relied on EEOC Management Directive 110 ("MD-110") when interpreting 29 C.F.R. part 1614.  *See, e.g., Payne v. Salazar,*

7

619 F.3d 56, 61, 61 fn.3 (D.C.Cir 2010); *Staropoli v. Donahoe,* 786 F.Supp.2d 384, 389, 390-91 (D.D.C. 2011) (Howell, J.); *Payne v. Locke,* 766 F.Supp.2d 245, 251 (D.D.C. 2011) (Kennedy, J.); *Augustus v. Locke,* 699 F.Supp.2d 65, 71 (D.D.C. 2010) (Sullivan, J.).   29 C.F.R. part 1614 also directly incorporates EEOC management directives such as MD-110.   *See* 29 C.F.R. § 1614.105(c).

The EEOC's instructions on conducting informal-stage EEO investigations in MD-110 generally discuss three categories of persons outside the EEO office whom may be provided information regarding a pending informal complaint: complainants, responding agency officials and witnesses with direct knowledge of the situation so identified by the EEO Counselor.   *See generally* MD-110, Appendix A (in particular, §§ B.1, D.2.A); *see also* MD-110, Ch. 2, § VI.A, *available at* http://www.eeoc.gov/federal/directives/md110.cfm.     MD-110 restricts the pool of persons with whom the EEO counselor can discuss the informal complaint and which documents that can be considered, and directs that any inquiry is supposed to be limited.   *See* MD-110, Ch. 2, §VI.A; *id.* at Appendix A, §§ D.2.A, D.2.B.   Under MD-110, the EEO Counselor decides what documents are reviewed and which individuals are interviewed about (and thus notified about) an EEO complaint.   *See* MD-110, Ch. 2, § VI.A; *id.* at Appendix A, § D.2.A, D.2.B.

In Plaintiff's case, EEO counselor Joy Savage did not issue any directions to Ms. Coleman permitting her to disclose the summary of Ms. Brunotte's interview to others, did not grant Ms. Coleman permission to so disclose (as Ms. Coleman never asked), and did not herself identify as witness (or herself interview) Ms. Lane, Mr. Drugley, Mr. Geist or Mr. Bolster.   *See* Statement at ¶ 10; *see also id.* at ¶ 50.   Therefore, any disclosure by Ms. Coleman was contrary to the EEOC's instructions in MD-110, and thus could not be considered as a disclosure "appropriate and necessary to perform the agency's functions under 29 CFR part 1614" such as

8

to fall under routine use "i".  As none of the 12 Privacy Act exceptions apply to Ms. Coleman's December 2005 disclosure, and as Plaintiff did not herself give written consent for the disclosure, that disclosure constituted a violation of 5 U.S.C. § 552a(b)(1).  In the alternative, a genuine issue of material fact exists as to whether Defendant violated the Privacy Act through Ms. Coleman's December 2005 disclosure of the EEO Counselor's notes of her interview of Ms. Brunotte, raising credibility issues requiring a trial to resolve.

### d.  Disclosure of the EEO Counselor's Notes of Ms. Brunotte's Interview was Intentional or Willful

While a plaintiff need not necessarily show that the "intentional or willful" standard has been violated in order for the Privacy Act to have been violated, that standard must be met in order for a plaintiff to recover damages for claims under 5 U.S.C. §§ 552a(g)(1)(C, D).  *See* 5 U.S.C. § 552a(g)(4).  As the D.C. Circuit explains, "the violation must be so 'patently egregious and unlawful' that anyone undertaking the conduct should have known it 'unlawful.'  Therefore, to meet its burden, the plaintiff must prove that the offending agency acted 'without grounds for believing [its actions] lawful' or that if 'flagrantly disregarded' the rights guaranteed under the Privacy Act." *See Laningham v. Navy,* 813 F.2d 1236, 1244 (D.C.Cir. 1987).  The legislative history of the Privacy Act indicates that the "intentional or willful" standard is "only somewhat greater than gross negligence".  *See id.* "The standard does not require the official to set out purposely to violate the Act." *Tijerina v. Walters,* 821 F.2d 789, 799 (D.C.Cir. 1987); *accord Thornburgh,* 888 F.2d at 876.  A plaintiff may meet her burden of showing that an agency's conduct was intentional or willful by presenting competent evidence to undercut the agency's explanation for its disclosures or otherwise affirmatively demonstrating the agency's intent behind the disclosure.  *See Thompson,* 400 F.Supp.2d at 13.  The courts have found probative the extent to which the disclosing officials deliberated and considered the Privacy Act implications of

their conduct before they made the disclosure.  *See Thornburgh,* 888 F.2d at 877-78; *see also Velikonja v. Mueller,* 362 F.Supp.2d 1, 23 (D.D.C. 2004) (Huvelle, J.).

The disclosure of the interview notes from the EEO counselor's interview was clearly not inadvertent, as Ms. Coleman was deliberately distributing what she knew to be documents pertaining to Ms. Brunotte's EEO complaint.  *See* Statement at ¶¶ 4-5, 7, 16; *see also id.* at ¶¶ 6, 16.  Indeed, Ms. Coleman's transmittal e-mail to Mr. Geist had the subject line "RB EEO Complaint Interview".  *See id.* at ¶ 4.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations generally to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in preparing a rebuttal to those allegations.  *See id.* at ¶¶ 21-48.  Yet, this explanation is patently false.  For a multitude of Ms. Brunotte's allegations discussed in the EEO Counselor's summary, Ms. Coleman and other witnesses admitted that Ms. Coleman made disclosures to individuals who were not expressly named in those allegations and whom did not have actual knowledge of the matters identified in the allegations.  Disclosures exemplifying those made by Ms. Coleman to witnesses not named in the allegations and/or without any personal knowledge of the matters within those allegations are discussed in greater detail at pages 13-17 of Plaintiff's Memorandum, restated and incorporated herein by reference for purposes of brevity.  As seen in the referenced examples of Ms. Coleman's disclosures, these recipients would not have been able to contribute to preparing responses to those allegations.  *See* Plaintiff's Memorandum at 17 fn.8, restated and incorporated herein by reference for purposes of brevity.  *See* Statement at ¶¶ 21-48.  Ms. Coleman also made no attempt to redact the disclosures so that the recipients only received portions in which they were expressly identified.  *See id.* at ¶ 17-19.

The only other reason which Ms. Coleman identified in her deposition testimony for disclosing the documents to Mr. Drugley and Ms. Lane were that they had independent access to Ms. Coleman's e-mail account and so would have had access to Ms. Savage's transmittal e-mail containing the statement anyway (Mr. Geist lacked such access). *See* Statement at ¶ 49. However, Ms. Coleman admitted that she did not know for a fact if Ms. Lane or Mr. Drugley had opened and read the transmittal e-mail from Ms. Savage. *See id.* Even assuming *arguendo* that Ms. Lane and Mr. Drugley possessed access to Ms. Coleman's e-mail account, their ability to hypothetically access an e-mail from Ms. Savage to Ms. Coleman does not, under the Privacy Act, authorize a separate subsequent act of disclosure, specifically Ms. Coleman's independent e-mail distributing the EEO Counselor's summary of her interview of Ms. Brunotte to Ms. Lane, Mr. Drugley and others.  Ms. Coleman's presumption is logically analogous to arguing that the fact that a Privacy Act-protected document is being stored in an unlocked office filing cabinet then authorizes an employee in that office to actively make photocopies of the Privacy Act-protected document and distribute the copies to everyone else who works in that office.  This presumption shows nothing less than blatant disregard for Ms. Brunotte's rights under the Privacy Act.  Thus, evidence exists undercutting the agency's explanation for its disclosures, demonstrating that the violation was intentional or willful. *See Thompson,* 400 F.Supp.2d at 13.

Ms. Coleman testified that her practice at the time was to confer with the general counsel or human resources offices on a case-by-case basis for guidance on Privacy Act issues. However, Ms. Coleman never asked for advice on the Privacy Act requirements on possible disclosure of Ms. Brunotte's EEO allegations. *See* Statement at ¶¶ 9, 11.  Ms. Coleman further

never sought such instructions from the EEO counselor.  *See id.*[1] Evidence of an intentional or willful violation exists where extensive discussions have occurred pre-disclosure, but where such discussions never touched upon the Privacy Act or its requirements.  *See Thornburgh,* 888 F.2d at 878.  Accordingly, the evidence shows that Ms. Coleman's December 2005 disclosure of the EEO counselor's interview of Ms. Brunotte meets the "intentional or willful" standard.

For all these reasons, the Court should find that Defendant willfully and intentionally violated the Privacy Act, 5 U.S.C. § 552a(g)(1)(D), when Defendant's agent Casey Coleman improperly disclosed the EEO counselor Joy Savage's summary of her interview of Ms. Brunotte to Gary Drugley, John Geist, Cecelia Brown and Steve Bolster in December 2005, or in the alternative should find that a genuine issue of material fact exists as to whether Defendant's violation of the Privacy Act was willful and intentional, raising credibility issues requiring a trial to resolve. *See, e.g., Thornburgh,* 888 F.2d at 877-78; *Tijerina,* 821 F.2d at 799.

### e. Plaintiff Suffered An Adverse Effect and Actual Damages from Defendant's Disclosure of the EEO Counselor's Notes

To recover damages under the Privacy Act for wrongful disclosure of records, a plaintiff must show both that she suffered some "adverse effect" from the disclosure, and separately that this adverse effect rose to the level of "actual damages" compensable under the Privacy Act. *See, e.g., Doe v. Dept. of Justice,* 660 F.Supp.2d 31, 49 (D.D.C. 2009) (Huvelle, J.). The courts instruct that the "adverse effect" standard differs from the "actual damages" standard, and that

---

[1]      Further evidence undercutting the plausibility that Ms. Coleman's disclosures were being made consistent with any intent to follow the Privacy Act can be shown by the fact that Ms. Coleman chose to distribute the EEO Counselor's summary of her interview of Ms. Brunotte through her personal, non-GSA, e-mail account on the Yahoo! private e-mail service. *See* Statement at ¶ 12.   Ms. Coleman sent the summary to Mr. Geist on his personal, non-GSA, e-mail account on the Comcast private e-mail service. *See id.*   The summary was further distributed by Defendant's agent Gary Drugley to Ms. Lane's personal, non-GSA, e-mail account on the Yahoo! private e-mail service. *See id.* Transmitting documents with personally identifying information on non-GSA e-mail systems is contrary to GSA policy. *See id.* at ¶ 13.

the threshold for "adverse effect"—the standard for raising a wrongful disclosure of records claim[2]—is lower than for "actual damages"—the standard for claiming money damages under the Privacy Act for wrongful disclosure of records. *See Doe v. Chao,* 540 U.S. 614, 624-25 (2004); *Gamble v. Dept. of the Army,* 567 F.Supp.2d 150, 156 (D.D.C. 2008) (Huvelle, J.); *Rice v. U.S.* 245 F.R.D. 3, 6 (D.D.C. 2007) (Robertson, J.).   The standard for showing "adverse effect" is sufficiently low that a claim of emotional distress qualifies. *See Albright v. U.S.,* 732 F.2d 181, 186 (D.C.Cir. 1984); *Gamble,* 567 F.Supp.2d at 156; *Rice,* 245 F.R.D. at 6.

As the Supreme Court recently clarified, the separate standard for "actual damages" requires the plaintiff to show "special damages" such as pecuniary damages. *See Federal Aviation Admin. v. Cooper,* No. 10-1024, 566 U.S. ____ at 10, 10 fn.6, 11, 14, 18, 2012 WL 1019969 (March 28, 2012) (Slip Op.).[3]   The courts have held out-of-pocket medical expenses to constitute a form of pecuniary damages compensable as "actual damages" under the Privacy Act.[4]   *See Albright v. U.S.,* 558 F.Supp. 260, 264 (D.D.C. 1982) (Richey, J.), *aff'd on other grounds* 732 F.2d 181 (D.C.Cir. 1984); *Houston v. U.S. Dept. of the Treasury,* 494 F.Supp. 24, 30, 30 fn.13 (D.C.D.C. 1979) (Parker, J.); see *generally Schroer v. Billington,* 106 Fair Empl. Pract. Cas. (BNA) 594, 2009 WL 1543686 (D.D.C. April 28, 2009) (Robertson, J.).   Out-of-pocket medical expenses includes expenses for hypnotherapy treatment. *Cf. Frantz v. City of*

---

[2]     The issue of whether or not a claim for attorneys' fees and costs for a violation of the Privacy Act for wrongful disclosure of records absent "actual damages" is unsettled. *See, e.g., Rice,* 245 F.R.D. at 7 fn.6.

[3]     Notably, the Supreme Court's decision in *Cooper* does not address the "adverse effect" standard, and thus leaves any preexisting caselaw on that standard unchanged. *See generally Cooper,* No. 10-1024, 2012 WL 1019969.

[4]     Additionally, at oral argument in *Cooper,* the Assistant Solicitor General representing the government conceded that out of pocket medical expenses constituted pecuniary damages compensable under the Privacy Act, even if intermediated through emotional distress. *See* Transcript of oral argument in *FAA v. Cooper* at 14-15, *available at* http://www.supremecourt.gov/oral_arguments/argument_transcripts/10-1024.pdf.

*Pontiac,* No. 04-CV-72904, 2007 WL 107773 (E.D.MI. January 9, 2007) (Steeh, J.).   Out-of-pocket medical expenses also include recoupment for mileage.   *See Mitchell v. Seaboard System Railroad,* 883 F.2d 451, 452-53 (6th Cir. 1989); *cited with approval McGovern v. Gallegos,* No. Civ. A. Nos. 84–1534 SSH/AK, 87–2320 SSH/AK, 1994 WL 193926 (D.D.C. May 4, 1994).   In Privacy Act cases where a proffer of compensable damages is made, courts have declined to decide the "actual damages" issue on summary judgment, and instead reserved the issue for trial.   *See Boyd,* 335 F.Supp.2d at 29; *see generally Frantz,* No. 04-CV-72904, 2007 WL 107773; *but see Rice,* 245 F.R.D. at 6-7 (only non-pecuniary emotional distress pled by plaintiffs).

In this case, Ms. Brunotte has met both the "adverse effect" and "actual damages" standards.   The record shows that Plaintiff suffered additional emotional distress from learning of Ms. Coleman's disclosures to Ms. Lane and Mr. Bolster.   *See* Statement at ¶¶ 51-52.   This emotional distress caused Ms. Brunotte to incur out-of-pocket pecuniary medical expenses, in the forms of mileage to visit her physicians and of out-of-pocket payments for treatments by Ms. Buckman.   *See id.* at ¶ 52.   The emotional distress-related pecuniary expenses for medical treatment clearly meet the standard of "adverse effect" under *Albright, Gamble* and *Rice.*   Ms. Brunotte's out-of-pocket expenses for medical treatment-related mileage and for treatment by Ms. Buckman constitute pecuniary damages, which meet the *Cooper* threshold for showing "actual damages". Therefore, Ms. Brunotte has shown that she has suffered an adverse effect from Defendant's agent Casey Coleman improperly disclosed the EEO counselor Joy Savage's summary of her interview of Ms. Brunotte to Gary Drugley, John Geist, Cecelia Brown and Steve Bolster in December 2005, an adverse effect which caused Ms. Brunotte to suffer actual damages.   In the alternative, a genuine issue of material fact exists as to whether Defendant's

violation of the Privacy Act caused Ms. Brunotte an adverse effect, which caused Ms. Brunotte to suffer actual damages, raising credibility issues requiring a trial to resolve.[5]

### f.   No Statute of Limitations Defense Applies to Ms. Coleman's Disclosures to Ms. Lane and Mr. Bolster

The Privacy Act statute of limitation is "two years from the date on which the cause of action arises."   *See* 5 U.S.C. § 552a(g)(5).   The "cause of action arises and the statute of limitations begins to run when 'the plaintiff knows or should know of the alleged violation'".   *See Tijerina*, 821 F.2d at 797-98.   Defendant's Motion seemingly argues that, because Plaintiff was notified of Ms. Coleman's disclosures to Mr. Drugley and Mr. Geist on March 10, 2006, Plaintiff's entire claim concerning wrongful disclosure of the EEO counselor's notes by Ms. Coleman (which was deemed filed *nunc pro tunc* on March 28, 2008 By Minute Order dated July 31, 2008) is untimely.   *See* GSA's Memorandum of Points and Authorities in Support of its Motion for Summary Judgment ("Defendant's Memorandum") at 1-3.   However, this argument overlooks the Ms. Coleman disclosed the EEO counselor's notes not just to Mr. Drugley and Mr. Geist, but to two other recipients as well:  Ms. Lane and Mr. Bolster.   *See* Statement at ¶¶ 4, 5, 7, 14.   Instead, the approach used by the Court and by the courts of this District for examining a Privacy Act claim for statute of limitations purposes is to look separately, alleged violation by alleged violation, to see when the plaintiff learned of the disclosure; the courts will not presume that learning of one violation places the plaintiff of other violations, even if similar.   *See, e.g., Ciralsky,* 689 F.Supp.2d at 158; *cf. Shannon v. General Electric Co.,* 812 F.Supp. 308, 318-322

---

[5]      *Clark* is factually distinct from this case.   In *Clark,* the documents disclosed were redacted first, while the documents Ms. Coleman produced to Ms. Lane were not redacted.   *See* Defendant's Memorandum at 17; *compare Clark v. Bureau of Prisons,* 407 F.Supp.2d 127, 129 (D.D.C. 2005)(Kennedy, J.) *to* Statement at ¶ 18.   The *Clark* court held that even this redacted disclosure, coupled with other facts, raised a triable issue of whether or not the "intentional or willful" standard was met.   *See* Defendant's Memorandum at 17; *Clark,* 407 F.Supp. 2d at 129.

(N.D.N.D. 1993) (Scullin, J.)  The distinction is material, as the record shows that Complainant did not learn of the disclosures to Ms. Lane and Mr. Bolster until August 2006, roughly five months after she first learned of Ms. Coleman's disclosures to Mr. Drugley and Mr. Geist.  *See* Statement at ¶ 51.  As August 2006 is less than 2 years from March 28, 2008—the date when Plaintiff's original Complaint was deemed filed—Ms. Brunotte's claims as to Ms. Coleman's disclosures to Ms. Lane and Mr. Bolster fall well within the Privacy Act statute of limitations.

**III.    Summary Judgment Should Be Denied On Ms. Brunotte's Second Cause of Action**

**a.    The GSA OIG Investigative File on Ms. Brunotte is a 'Record' Contained Within the GSA/ADM-24 or GSA/ADM-25 'Systems of Records'**

Defendant, in its motion for summary judgment, does not argue that the investigative files of Defendant's OIG on Ms. Brunotte are not a record within a system of records governed by the Privacy Act, and so Plaintiff submits that it is undisputed that the disclosed information was a 'record' contained within a Privacy Act 'system of records', thus establishing the first element of Plaintiff's unlawful disclosure cause of action.  The record clearly shows that GSA retains its OIG investigative files in either the GSA/ADM-24 or GSA/ADM-25 system of records.  *See* Statement at ¶ 95.  Defendant in its Motion concedes that the records are held, in whole or in part, in the GSA/ADM-24 system of records.[6]  *See* Defendant's Memorandum at 42.

**b.    Defendant Improperly Disclosed Its OIG Investigative Files on Ms. Brunotte to GPO**

---

[6]    Notably, while Defendant's Privacy Act system of records notices for GSA/ADM-24 would purport to invoke 5 U.S.C. § 552a(j)(2) to immunize those systems of records from most provisions of the Privacy Act, the nondisclosure restrictions of 5 U.S.C. § 552a(b) cannot be exempted under the express text of 5 U.S.C. § 552a(j)(2), and the courts have held that the remedial provisions of 5 U.S.C. § 552a(g) still render Defendant liable if it were to have been found to have engaged in wrongful disclosures in violation of the Privacy Act.  *Compare* 69 Fed.Reg. 78,035 (December 29, 2004); 68 Fed.Reg. 16,800 (April 7, 2003) *to* 5 U.S.C. § 552a(j)(2) (subsection (b) not able to be exempted); *Tijerina,* 821 F.2d at 797 ("We therefore hold that a governmental entity cannot employ subsection (j) to exempt itself from subsection (g)'s provisions for civil liability for violations of the Act.").

The courts have held that a disclosure under the Privacy Act occurs when information derived from a Privacy Act system of records is disclosed verbally, even if the specific documents from the relevant system of records which contained that information are not directly released at that point. *See Doe v. U.S. Postal Service,* 317 F.3d 339 (D.C. Cir. 2003); *Krieger v. Fadely,* 211 F. 23d 134 ( D.C. Cir. 2000); *Bartel v. Federal Aviation Administration,* 725 F.2d 1403, 1408-09 (D.C.Cir., 1984); *Chang v. Dep't of the Navy,* 314 F. Supp. 2d 35, 41, 41 fn.2 (D.D.C. 2004); *Pilon v. Dept. of Justice,* 796 F.Supp. 7, 12 (D.D.C. 1992) (Greene, J.). Therefore, Mr. Mannion's communications with Mr. Brown have to be properly examined as two separate disclosures:  Mr. Mannion's earlier verbal disclosure to Mr. Brown on November 20, 2006, and Mr. Mannion's later fax transmittal of documents from the GSA OIG investigative file on Ms. Brunotte on November 21, 2006.  *See* Statement at ¶¶ 75, 80, 89, 94, 95.  Mr. Mannion's disclosures to Mr. Brown were not made pursuant to any request by, or with the prior written consent of, Ms. Brunotte.  *See id.* at ¶ 80.  Therefore, unless one of the twelve exceptions applies, Mr. Mannion's disclosure was in violation of the Privacy Act.  Even a cursory examination of the evidence of record shows that most of the exceptions indisputably do not apply to this disclosure.[7]  Two other exceptions—responses to law enforcement requests and "need to know"—are also inapposite here, and in fact are not even raised by Defendant in its Motion.  *See* Defendant's Memorandum at 32 (only citing "routine use" exception under 5 U.S.C. § 552a(b)(3)).   First, the "need to know" exception under 5 U.S.C. §552a(b)(1) is

---

[7]     No part of the record evidences any Freedom of Information Act request made for the notes of Ms. Brunotte's interview by Ms. Savage; Ms. Coleman's December 2005 disclosure was not made to the Bureau of the Census, the National Archives and Records Administration, Congress, the Government Accountability Office, a court, a consumer reporting agency, or to any person claiming the need to access the records for statistical research purposes or to protect the health and safety of an individual.   Accordingly, the exceptions listed at 5 U.S.C. §§ 552a(b)(2, 4-6, 8-12) are not relevant to Mr. Mannion's November 2006 disclosure.

inapplicable to Mr. Mannion's disclosure to Mr. Brown, as this only permits disclosures to "officers and employees of the agency which maintains the record"; disclosures between agencies—such as the case here, from GSA to GPO—are not covered. *See* 5 U.S.C. §552a(b)(1). Second, the "law enforcement" exception under 5 U.S.C. § 552a(b)(7) is also inapplicable, as it applies only "if the head of the agency or instrumentality has made a written request to the agency which maintains the record specifying the particular portion desired and the law enforcement activity for which the record is sought". *See* 5 U.S.C. §552a(b)(7).  That exception is inapplicable here.  Mr. Mannion initiated his contact with GPO on his own initiative, and not in response to any request for information from GPO whatsoever. *See* Statement at ¶¶ 75, 90. The D.C. Circuit has found the fact that the original disclosure was unsolicited to be dispositive when analyzing routine uses phrased as allowing disclosures "in response to" queries. *See Tijerina,* 821 F.2d at 798.  Further, GPO's request for GSA to produce the investigative file on Ms. Brunotte—after Mr. Mannion had unilaterally initiated contact with Mr. Brown and unilaterally verbally disclosed Privacy Act-protected information regarding Ms. Brunotte—was made by Mr. Brown, who was not "the head of the agency or instrumentality".  *See* Statement at ¶¶ 76-77.  Further, Mr. Brown did not make his request in writing. *See id.* at ¶ 89. Therefore, the 5 U.S.C. § 552a(b)(7)   'law enforcement' exception is also inapplicable.

The "routine use" exception under 5 U.S.C. § 552a(b)(3) is similarly unavailing in this case.  Defendant's OIG records concerning Ms. Brunotte that were disclosed by Mr. Mannion to Mr. Brown were covered by either/both the GSA/ADM-24 or GSA/ADM-25 system of records. *See* Statement at ¶ 95.  At the time of Mr. Mannion's call to Mr. Brown, the routine uses for GSA/ADM-24 and GSA/ADM-25 were identical.  *Compare* 68 Fed.Reg. 16,798-99 (April 7, 2003) *to* 69 Fed.Reg. 78,034-35 (December 29, 2004).  These two Privacy Act system of records

notices specify fourteen routine uses.  *See id.*  Even a cursory examination of the evidence of record shows that ten of these routine uses indisputably do not apply to this disclosure.[8]  The remaining routine uses, while not ultimately applicable here, bear closer examination.  Prior to Mr. Mannion contacted Mr. Brown, GPO's Office of Inspector General ("GPO OIG") had no active investigation into Ms. Brunotte, and GPO's Office of Inspector General had made no information requests to GSA concerning Ms. Brunotte. *See* Statement at ¶¶ 90- 91.   Further, prior to Mr. Mannion's call to Mr. Brown, GPO had provided no information concerning Ms. Brunotte to GSA's Office of Inspector General.  *See id.* at ¶¶ 75, 82.  Therefore, routine use 5 does not apply to either Mr. Mannion's disclosures, and routine use 8 does not apply to Mr. Mannion's original telephone call to Mr. Brown on November 20, 2006.  *See* 69 Fed.Reg. 78,034-35 (December 29, 2004), 68 Fed.Reg. 16,798-99 (April 7, 2003); *see also Britt v. Naval Investigative Service,* 886 F.2d 544, 548 fn.1 (3rd Cir. 1989).   The remaining two routine uses (1 and 7) from GSA/ADM-24 and GSA/ADM-25 are as follows:

> 1. A record of any case in which there is an indication of a violation of law, whether civil, criminal, or regulatory in nature, may be disseminated to the appropriate Federal, State, local, or foreign agency charged with the responsibility for investigating or prosecuting such a violation or charged with enforcing or implementing the law. […]
> 7. A record may be disclosed to a Federal, State, local, foreign, or international law enforcement agency to assist in crime prevention and detection or to provide leads for investigation.

*See id.* (excluding *Britt).* For both of these routine uses, Mr. Mannion's disclosure to Mr. Brown fails for several reasons.   First, Mr. Mannion's disclosure to Mr. Brown fails to meet the

---

[8]     Mr. Mannion's disclosure was not made to Congress, a foreign country, the Office of Management and Budget, to a GSA contactor or GSA physician, to Ms. Brunotte or her attorney, to the public/news media/trade associations for education purposes (and was not redacted), to an to any adjudicator or examiner processing an employee's grievance or complaint, to any officer conducting a qualitative assessment review of GSA OIG's investigative methods, a court or grand jury.  Accordingly, routine uses 2-4, 6, 9-14 do not apply. *See* 69 Fed.Reg. 78,034-35 (December 29, 2004), 68 Fed.Reg. 16,798-99 (April 7, 2003).

"compatibility" requirement of *Radack* and similar cases.  Under that line of cases, a record can only be put to a use compatible with the purpose for which it was collected.  *See Radack,* 402 F.Supp.2d at 104-05.  The instant case is one where a record compiled by an inspector general's office was then released to a prospective employer of the subject of that investigation.  *See. e.g.,* Statement at ¶¶ 67-68, 71, 80, 95.  The courts have found such disclosures in violation of the Privacy Act.  The leading case on this issue is the Third Circuit's decision in *Britt v. Naval Investigative Service,* 886 F.2d 544 (3rd Cir. 1989).  Britt was a civilian employee of the Immigration and Naturalization Service (specifically, an INS special agent who "conducted investigations which resulted in administrative and criminal prosecutions") who was also a military reservist in the Marine Corps Reserves.  *See id.* at 545.  The Naval Investigative Service conducted an investigation into Britt concerning a potential criminal infraction involving requisition and storage of ammunition.  *See id.*  During the pendency of that investigation, the assigned investigator (Simprini) contacted Britt's civilian supervisor (Karn), first verbally disclosing the allegations against Britt, and then later providing the full Naval Investigative Service investigative file to Britt's civilian supervisor, who was logically also attached to a criminal investigative unit of NIS. *See id.*  As part of its defense against Britt's resultant Privacy Act suit, the Naval Investigative Service cited the "routine use" exception for the investigative files on Britt, which included a routine use permitting disclosures "To other investigative units (federal, state or local) for whom the investigation was conducted, or who are engaged in criminal investigative and intelligence activities; federal regulatory agencies with investigative units." and referencing the fact that Britt's civilian employer—the Immigration and Naturalization Agency—is in relevant part a criminal investigative organization.  *See id.* at 547-50.  In other words, just like GSA's Office of Inspector General ("GSA OIG") in the instant

matter, NIS cited a 'law enforcement to law enforcement' routine use to justify its disclosure of a criminal investigative file to the subject employee's current/future employer.  The court roundly rejected this use, for lack of compatibility.   Specifically, the *Britt* court reasoned that the case-specific purpose for the original collection of information by NIS regarding Britt (assessment of possible criminal and administrative charges directly tied to Britt's involvement with the requisitioned ordinance) was tied to specific wrongdoing by Britt.  *See id.* at 549.  The *Britt* court then explained how NIS' disclosure still violated the Privacy Act despite the plain text of the "routine use", due to the lack of "compatibility" between NIS' purpose for collecting information in its investigation, and the purposes for disclosing to Britt's civilian supervisor at INS:

> **There is nothing in the record suggesting that the INS was conducting its own criminal investigation of the same activity or any other activity by Britt for that matter** […]. **Instead, the government argues simply that the information "could have had a bearing on [Britt's] specific job" with the INS. In other words, the NIS released the information to Karn because it believed that Karn might find it relevant to have information suggesting a lack of integrity in his subordinate.**

> **Relevance, however, is not the standard Congress placed in section 552a(a)(7). Congress limited interagency disclosures to more restrictive circumstances.** There must be a more concrete relationship or similarity, some meaningful degree of convergence, between the disclosing agency's purpose in gathering the information and  in its disclosure. *See* […] *Mazaleski v. Treusdell,* 562 F.2d 701, 713 n. 31 (D.C.Cir.1977) (derogatory information concerning a federal employee's dismissal not compatible with disclosure to prospective employer) (dictum); […] We conclude therefore that NIS' use of the information compiled as to Britt, […] by disclosing it to Britt's civilian employer (albeit a government agency) was not compatible with the purpose "for which the information was collected." […]

> In order to address these concerns, the compatibility requirement of 5 U.S.C. § 552a (a)(7) limits interagency exchange of information. […] **However, if the numerous government agencies which collect information about individuals are free to share their information with others, bound only by the standard of relevance to the recipient agency, the purpose of the limitation in 5 U.S.C. § 552a(a)(7) may be nullified. For the same reason the agency cannot, by the mere publication of broad routine use purposes, evade the statutory requirement that disclosure must be compatible with the purpose for which**

**the material was collected.** We hold therefore that the district court erred in granting summary judgment for the government.

*See id.* at 549-50 (emphasis added, internal citations omitted).  Courts in the D.C. Circuit have adopted *Britt*'s "compatibility" standard*,* at least outside of certain specific special statutory contexts such as labor law issues under the National Labor Relations Act.  *See U.S. Postal Service v. Nat'l Ass'n of Letter Carriers,* 9 F.3d 138, 139, 144-46 (D.C.Cir. 1993); *Pontecorvo v. FBI,* Case No. 00-1511 at 4-5, 10-11 (D.D.C. Sept. 30, 2001) (slip. op., attached as Exhibit 61) (Kollar-Kotelly, J.).   Similar to *Britt,* Defendant here disclosed case-specific information, information it had originally collected for the purpose of investigating specific wrongdoing (here, alleged travel reimbursement infractions).  *See* Statement at ¶¶ 54, 57, 80, 95.  Just as in *Britt,* GPO here did not have any investigation pending concerning the subject of the criminal investigation, Ms. Brunotte—at least, not before Mr. Mannion unilaterally called Mr. Brown on November 20, 2006, and disclosed information of GSA's investigation to GPO, an agency which was expected to be employing the subject of the GSA investigation in the near future.  *See* Statement at ¶¶ 67-68, 71, 80, 90-91, 95.  The reasons offered by Mr. Mannion, Mr. Martinez and Mr. Stewart were of a similar character to those of by NIS in *Britt*:  the belief that prior conduct by the subject of a criminal investigation (here, Ms. Brunotte) might indicate a lack of integrity on her part which might be of relevance to the outside employer federal agency. *See* Statement at ¶¶ 83, 105-06.  Therefore, just as in *Britt,* GSA fails to meet the "compatibility" requirements of the Privacy Act, and so the "routine use" exception does not justify Mr. Mannion's disclosure to Mr. Brown—even when, just as in *Britt,* the disclosure was from law enforcement to law enforcement.

Second, the courts hold agencies to a standard of sufficient proof of a possible criminal violation before permitting disclosures under routine uses such as GSA/ADM-24 and

GSA/ADM-25 routine uses 1 and 7, and have found Privacy Act violations where the evidentiary basis for the allegations of criminality are too speculative.  A leading case from the D.C. Circuit on this issue is *Tijerina v. Walters*.   Tijerina had been investigated by the Veterans Administration over allegations that he had falsified a document in a federal loan guarantee program.  *See Tijerina,* 821 F.2d at 791-92.  The allegations were referred to the prosecutor, who decided ultimately not to prosecute.  *See id.* at 792.  During the investigation, the VA learned that Tijerina might take the Texas bar exam.  *See id.* An agent of the VA Office of Inspector General unilaterally contacted the Texas bar authorities and notified them of the existence of the OIG investigation into Tijerina, and offered to provided additional information if requested.  *See id.* In response, the Texas bar asked to see the investigate materials referenced in the letter, and the VA OIG provided its investigative file on Tijerina to the Texas bar.  *See id.* at 792.  As a result, the Texas bar found Tijerina morally unfit to practice law and denied his application for bar admission.  *See id.* Among other defenses, the VA claimed that its disclosures to the Texas bar were permitted by routine use "5" on the relevant Privacy Act system of records notice:

> 5. Any information in this system […] which is relevant to a suspected violation or reasonably imminent violation of law, whether civil, criminal or regulatory in nature and whether arising by general or program statute or by regulation, rule or order issued pursuant thereto, may be disclosed to a Federal, State, local or foreign agency charged with the responsibility of investigating or prosecuting such violation, or charged with enforcing or implementing the statute, regulation, rule or order issued pursuant thereto.

47 Fed.Reg. 24,012 (June 2, 1982); *Tijerina,*  821 F.2d at 798.  The VA specifically argued that Tijerina might somehow be engaging in a violation of law by applying to the Texas bar, and that disclosure was therefore authorized under the routine use to prevent the violation of law.  *See Tijerina,*  821 F.2d at 798.  The D.C. Circuit rejected this argument, finding that the alleged possible violation too speculative to authorize disclosure under the Privacy Act:

> The government first contends that the Silverstein letter was authorized under Routine Use five […] The government argues this Routine Use applies to the Silverstein letter because that disclosure helped the Texas Board of Law Examiners investigate a possible violation of the Texas statute that forbids persons from sitting for the bar unless they have demonstrated good moral character. It is not clear, however, that Mr. Tijerina would have violated the Texas statute by taking the bar examination. Even if Mr. Tijerina would have violated Texas law by sitting for the bar examination, the violation was not conceivably "reasonably imminent" at the time of the Silverstein letter; the OIG knew only that Mr. Tijerina might take the Texas bar examination at some time in the future. Routine Use five by its terms does not justify disclosure on the basis of such remote speculation.

*See id*. Ms. Brunotte's case is similar to Mr. Tijerina's case. Like *Tijerina*, Ms. Brunotte was under investigation by a federal agency's office of inspector general for allegations of falsification, where charges had been referred for prosecution but prosecution was ultimately dropped. *See* Statement at ¶¶ 54, 57-58. Like *Tijerina*, an officer of the investigating OIG, Mr. Mannion, took it upon himself to unilaterally disclose the fact of an OIG investigation to an outside party, with the OIG later producing the investigative file to the disclosure recipient when they accept the tacit invitation to request the file. *See id.* at ¶¶ 80, 89, 95. Like *Tijerina,* the OIG lacked any clear evidence (in fact, no evidence at all) at the time of the disclosure that Ms. Brunotte had actually violated the law in her application to work for GPO—indeed, Mr. Mannion admitted he did not even have basis to believe that Ms. Brunotte had violated the law in some fashion in applying to GPO. *See id.* at ¶¶ 83-84. The routine uses here (GSA/ADM-24 and GSA/ADM-25 routine uses 1 and 7) are similar to routine use "5" in permitting disclosures to law enforcement agencies for crime prevention purposes. *Compare* 69 Fed.Reg. 78,034-35 (December 29, 2004), 68 Fed.Reg. 16,798-99 (April 7, 2003) *to* 47 Fed.Reg. 24,012 (June 2, 1982).[9] Therefore, just as in *Tijerina,* GSA's grounds for accusing Ms. Brunotte of wrongdoing

---

[9]      The fact that routine use "7" use the more vague phrasing "to assist in crime prevention" and "to provide leads for investigation" is of no moment here, in that it is facially implausible

in connection with her GPO job application were too speculative to justify unilateral disclosure of the contents of Ms. Brunotte's GSA OIG investigative file to GPO under the Privacy Act, and so routine uses 1 and 7 provide no valid excuse to legitimize Mr. Mannion's disclosures to GPO.

As none of the 12 Privacy Act exceptions apply to either or both of Mr. Mannion's November 2006 disclosures to Mr. Brown, and as Plaintiff did not herself give written consent for the disclosure, that disclosure constituted a violation of 5 U.S.C. § 552a(b)(1).   In the alternative, a genuine issue of material fact exists as to whether Defendant violated the Privacy Act through Mr. Mannion's November 20, 2006 disclosure of information from Defendant's OIG investigative file to Mr. Brown, raising credibility issues requiring a trial to resolve.

### c.   Defendant's Disclosure of its OIG Investigative Files on Ms. Brunotte to GPO was Intentional or Willful

Defendant's disclosure of its OIG Investigative Files on Ms. Brunotte and the information contained therein to GPO was clearly not inadvertent.  Mr. Mannion called up Mr. Brown, an individual who he had never worked with before and had only met at a conference and had not spoken with since, and unilaterally disclosed information concerning the existence and nature of the criminal charges against Ms. Brunotte stemming out of his investigation.  *See* Statement at ¶¶ 75, 80.  Mr. Mannion's fax the next day of Defendant's investigative file on Ms. Brunotte (with the notable omission of the Ms. Brunotte's actual pretrial diversion agreement)

---

that the goals of crime prevention or providing leads for investigation would be served through the provision of *false* information.  The record contains evidence indicating that Mr. Mannion falsely told Mr. Brown at GPO that Ms. Brunotte was on probation and not pretrial diversion; GPO, in later producing the investigate file to GPO, further omitted the actual pretrial diversion agreement, which would have most clearly evidenced that Mr. Mannion's characterizations were false and that Ms. Brunotte was in fact not on probation.  *See* Statement at ¶¶ 58, 80, 92, 94. Notably, Ms. Brunotte was actually neither on probation nor on pretrial diversion at the time of Mr. Mannion's telephone call to Mr. Brown on November 20, 2006, as her pretrial diversion agreement had been fully completed almost a month earlier, with Ms. Brunotte discharged from pretrial diversion no later than October 27, 2006. *See id.* at ¶¶ 58, 60, 96.

only occurred after Mr. Mannion and Mr. Stewart had discussed the matter and then reviewed the file to select what documents to send or omit.  *See id* at 93-94.

Defendant's defense on this claim, in many respects, rises and falls upon the credibility of one individual, Kerry Mannion, a rookie investigator who took it upon himself to make the decision to contact GPO on November 20, 2006, and to unilaterally disclose Privacy Act-protected information regarding Ms. Brunotte from the GSA/ADM-24 and GSA/ADM-25 Privacy Act systems of records to GPO without first consulting his supervisors in GSA OIG.[10] *See* Statement at ¶¶ 56, 80, 88, 95; *see also* Defendant's Memorandum at 37.  The evidence of record, however, clearly shows that Mr. Mannion's credibility is severely compromised, raising genuine issues of material fact as to any of his testimony which require a trial to adjudicate.  Mr. Mannion's credibility is first in doubt as to the motives behind his decision to call Mr. Brown in the first place.  Ms. Brunotte's case was one of the first that Mr. Mannion ever investigated as a rookie special agent at Defendant's OIG—and yet Mr. Mannion's investigation did not lead to Ms. Brunotte's conviction.  *See* Statement at ¶¶ 56, 58.  Even after the prosecutor had notified Mr. Mannion that the charges against Ms. Brunotte were being dismissed and that Ms. Brunotte was being referred to pretrial diversion, during a time when Mr. Mannion admitted that he was not investigating any allegations against Ms. Brunotte, Mr. Mannion still sought to place a hidden recording device (a 'wire') on one of Ms. Brunotte's coworkers in hopes of finding additional unspecified evidence against Ms. Brunotte.[11]  *See id.* at ¶¶ 57, 59, 65.

---

[10]     Later disclosure of the actual OIG investigative file to GPO does not negate Ms. Brunotte's claim, if Mr. Mannion's original unsolicited disclosure of Privacy Act-protected information was intentional or willful—especially if the later disclosure was tacitly invited by Mr. Mannion.  *Compare Tijerina,* 821 F.2d at 791-92, 798-99 *to* Statement at ¶¶ 80, 89, 95.

[11]     Mr. Mannion did not record his communications with the AUSA in the investigative file; Mr. Stewart indicated that omission of major communications from that file might be consistent with a special agent's attempt to hide the communication.  *See* Statement at ¶¶ 59. 81 fn.10.

Into this mix stepped Mr. Drugley and. Ms. Coleman. Mr. Drugley was an employee of Defendant who, the evidence indicates, learned that Ms. Brunotte had received pretrial diversion and would have been involved with implementing the settlement agreement that resolved her proposed removal in a fashion that would allow her to remain in federal service, and further learned (apparently from Ms. Coleman) that Ms. Brunotte was in fact going to be moving into a new job at another federal agency. *See* Statement at ¶¶ 63, 71, 73. Mr. Drugley was upset that Ms. Brunotte was not sent to jail or fired for the issues investigated by Mr. Mannion, and who thought that Ms. Brunotte had not been punished severely enough. *See id.* at ¶ 72. As a result, Mr. Drugley called Mr. Mannion "to rag HIS [sic] ass for not getting her [Ms. Brunotte] fired." *See id.* Mr. Drugley then proceeded to contact Mr. Mannion, and to disclose to Mr. Mannion that Ms. Brunotte was not being removed and was moving to a new job at GPO. *See id.* at ¶ 72.

Mr. Drugley's excuse for contacting Mr. Mannion is contradicted by evidence of record. Mr. Drugley claimed that this discussion with Mr. Mannion was part of continuing "information sharing" associated with Mr. Mannion's investigation of Ms. Brunotte—but that investigation had been inactive for about 9 months (a fact which Ms. Coleman would have understood from the pretrial diversion agreement) and Mr. Drugley admitted that he in fact had no definite information to share with Mr. Mannion. *See id.* at ¶¶ 65, 73. However, Mr. Drugley claimed that he only served as an intermediary for information releases by Ms. Coleman. *See* Statement at ¶ 73. Ms. Coleman, a Responding Management Official (RMO) in Ms. Brunotte's EEO complaint, had personally initiated the investigation against Ms. Brunotte, and had personally proposed Ms. Brunotte's firing. *See id.* at ¶¶ 3, 53, 70. Ms. Coleman had likely been notified of the terms of Ms. Brunotte's settlement agreement at or around the time that the agreement was signed. *See id.* at ¶ 71. The record indicates Ms. Coleman having on a prior occasion used the

disclosure of the existence of Mr. Mannion's investigation into Ms. Brunotte to block Ms. Brunotte's attempt to transfer away from Ms. Coleman. *See id.* at ¶ 63. Further, a coworker observed Ms. Coleman and Mr. Drugley gleefully discussing "having something on Ms. Brunotte" in the workplace. *See id.* at ¶ 64. Ms. Brunotte draws the reasonable inference from these facts that Ms. Coleman and Mr. Drugley had motive to take steps to seek that further punishment be inflicted on Ms. Brunotte. *See id.* at ¶ 72.

Several other genuine issues of material fact exist as to the credibility of Mr. Mannion[12] and Mr. Drugley's accounts of their conversation. Mr. Mannion, a special agent failed to contemporaneously record his conversation with Mr. Drugley; Mr. Stewart indicated that the absence of such a record would be suggestive of, or at least consistent with, an attempt to hide a possible Privacy Act violation. *See* Statement at ¶ 81. Mr. Drugley's claim that he spoke regularly with Mr. Mannion was contradicted by Mr. Mannion, who denied any contact with Mr. Drugley between March 2006 and November 2006. *See id.* at ¶ 66.

Mr. Mannion claimed that he did not record Mr. Drugley's call as he did not deem it a "significant event" and/or "significant activity"—and admitted that he did not even know if Mr. Drugley's claims were true. *See* Statement at ¶¶ 81, 83. Yet, the very same day that he spoke to Mr. Drugley, rookie agent Mr. Mannion then called Mr. Brown at GPO, and—without conferring with his supervisors first—unilaterally volunteered to Mr. Brown that Ms. Brunotte had been investigated by GSA OIG. *See id.* at ¶¶ 56, 72, 75, 80, 88. According to Mr. Stewart, any such alleged 'investigative activity' occurring without conferring with supervisors first was contrary to GSA OIG policy for a rookie agent (such as Mr. Mannion), as a higher degree of participation

---

[12]    Mr. Mannion further claimed that he and Mr. Brown approached AUSA Haney to press further charges against Ms. Brunotte, a claim refuted by Mr. Brown's testimony that the purpose for contacting AUSA Haney was to ask for clarification on a couple issues—and that Mr. Mannion was not even present at the meeting. *See* Statement at ¶¶ 96-97.

with senior agency.  *See id.* at ¶¶56, 88.  Testimony in the record indicates the likelihood that Mr. Mannion lied to Mr. Brown, telling him falsely that Ms. Brunotte was on probation when Mr. Mannion had been clearly on notice for months that Ms. Brunotte had only been on pretrial diversion.  *See id.* at ¶¶ 59-60, 80, 94.  Mr. Mannion's supervisors testified that making false statements concerning the status of criminal charges against Ms. Brunotte would be against their wishes, and thus presumably against Defendant's own policies.  *Cf. id.* at ¶ 94.  However, it is impossible to know the exact text of Mr. Mannion's conversation with GPO, as Mr. Mannion, a special agent, failed to contemporaneously record his conversation with Mr. Brown; Mr. Stewart indicated that the absence of such a record would be suggestive of, or at least consistent with, an attempt to hide a possible Privacy Act violation, given the possible criminal penalties associated with a Privacy Act violation. *See id.* at ¶ 81.  Further, the evidence suggests that Mr. Mannion also disclosed to GPO the existence of Ms. Brunotte's agreement settling her EEO case and the proposed removal (a disclosure which would violated the expunction and neutral reference terms of the settlement agreement)—and apparently made no attempt to ascertain if such a disclosure was permissible first.  *See id.* at ¶¶ 71, 102.  Further, as discussed in greater detail *infra,* Mr. Mannion's pretext for calling Mr. Brown—alleged falsification by Ms. Brunotte of her application to work for GPO—was based on no evidence whatsoever, other than the belief that since Ms. Brunotte was applying to GPO, she presumably had to have lied on the application. *See, e.g.,* Statement at ¶¶ 83-84, 86, 106 fn.13.

After having enticed Mr. Brown (through unilateral disclosure of the criminal allegations) into requesting a copy of the GSA OIG investigative file into Ms. Brunotte, Mr. Mannion then contacted his supervisors (apparently for the first time) to arrange for production of the investigative file. *See* Statement at ¶¶ 77, 78, 80, 89.  The evidence indicates that Mr. Mannion

lied to Mr. Stewart in order to get the investigative file produced, claiming that a joint investigation was ongoing with GSA OIG and GPO OIG when that was impossible; prior to Mr. Mannion's call, GPO OIG was not investigating Ms. Brunotte, and Mr. Brown lacked authority to authorize any joint investigation.  *See id.* at ¶¶ 91, 93.  Mr. Stewart testified that Mr. Mannion falsely told him that Ms. Brunotte's pretrial diversion agreement had not been finalized, when Mr. Mannion had not only been notified of the pretrial diversion agreement 8 months earlier, but also had confirmed receipt of a signed copy of that very pretrial diversion agreement 5 months earlier.  *See id.* at ¶¶ 59-60, 92, 94.  As a result of the discussions between Mr. Mannion and Mr. Stewart, Mr. Stewart let Mr. Mannion to produce the investigative file to Mr. Brown in modified form, specifically stripping the actual pretrial diversion agreement, the document which Mr. Martinez testified was the best evidence that Ms. Brunotte was not on probation.  *See id.* at ¶ 94.

More generally, the actions of GSA OIG personnel were not based on any sort of careful review or thorough understanding of their duties under the Privacy Act.  Mr. Stewart claimed an understanding of the Privacy Act—but even though he specifically cited 5 U.S.C. § 552a(j)(2) in his analysis, he made the reckless assertion that the (j)(2) exception immunized all law enforcement-related communications from the Privacy Act, even though 5 U.S.C. § 552a(j) expressly does not permit waiver of the Privacy Act disclosure rules under 5 U.S.C. § 552a(b).  *See* Statement at § 104.  Mr. Martinez testified that his understanding of the Privacy Act (based on what Mr. Stewart told him) was that it would permit an agency to give a "head's up" to an investigative subject's prospective employers, just because the individual was applying for a job—especially if the prospective employer was government agency, in the interest of "protecting the government".  *See id.* at ¶ 105.  Mr. Martinez' testimony mirrors the rationale alleged for the Privacy Act violation in *Britt*.  *Compare id. to Britt*, 886 F.2d at 549-50. Perhaps

the most egregious is Mr. Mannion himself, whose understanding from the training and experience referenced by Defendant in its Motion was that the Privacy Act permitted law enforcement officers to share any information whatsoever with each other without restriction. *Compare* Defendant's Memorandum at 37 *to* Statement at ¶ 107.  Defendant argues that Mr. Mannion "believed that he could do this because none of his training indicated that he could not do it."  *See* Defendant's Memorandum at 37.  However, this approach is the opposite of the OMB authoritative guidance on the Privacy Act, which states that "Agencies should not automatically disclose a record to someone other than the individual to whom it pertains simply because such disclosure is permitted by this subsection. Agencies shall continue to abide by other constraints on their authority to disclose information to a third party including [...] the likely effect upon the individual of making that disclosure."  *Compare id. to* 40 Fed.Reg. 28,953 (July 9, 1975); *see generally* 5 U.S.C. § 552a(v)(1).  Evidence that Mr. Mannion's actions clearly violated the Privacy Act is found in the fact that GSA attorney Roland Ben, when he learned of Mr. Mannion's actions, stopped talking to Mr. Mannion and reported to Mr. Mannion's supervisors at GSA OIG that he was upset with Mr. Mannion.  *See* Statement at ¶ 103.

In short, Mr. Mannion's many false statements (both to Mr. Brown and to Mr. Stewart) which appear instrumental toward the goal of seeking to block Ms. Brunotte's moving into a new job at GPO through the disclosure of the GSA OIG investigative file on Ms. Brunotte to GPO (even in violation of Ms. Brunotte's settlement agreement with GSA), a tactic consistent Mr. Mannion's own egregious proposal to a put a wire on Ms. Brunotte's coworker to seek evidence against her even after the criminal prosecution against her was dismissed, with Ms. Coleman's prior conduct in blocking Ms. Brunotte's detail, with Mr. Drugley's having "rag[ged] HIS ass for not getting her fired."  Mr. Mannion took steps to hide his conduct by not memorializing his

31

contacts with Mr. Drugley and Mr. Brown under suspicious circumstances which suggested an intent to avoid later criminal liability.   These facts of record demonstrate the kind of flagrant disregard for Ms. Brunotte's rights under the Privacy Act, and thus show that Mr. Mannion's disclosure of the OIG investigative file on Ms. Brunotte and the information contained therein to GPO meets the "intentional and willful" standard.  In the alternative, a genuine issue of material fact exists as to whether Defendant's violations of the Privacy Act were intentional and willful, raising credibility issues requiring a trial to resolve.

### d. Plaintiff Suffered An Adverse Effect and Actual Damages from Defendant's Disclosure of its OIG Investigative Files to GPO

In this case, Ms. Brunotte has met both the "adverse effect" and "actual damages" standards with regard to Mr. Mannion's disclosure of the GSA OIG Investigative Files on Ms. Brunotte to Mr. Brown at GPO.   Until Mr. Mannion contacted Mr. Brown, GPO had no investigation pending into Ms. Brunotte, and had in fact given her a job offer.  *See* Statement at ¶¶ 68, 90-91.  The record clearly shows that the sole reason GPO withdrew its job offer to Ms. Brunotte was information it that it had received from GSA OIG, and evidence of record indicates that Mr. Mannion's disclosures were the sole source of information from GSA OIG to GPO concerning GSA OIG's investigation into Ms. Brunotte.  *See id.* at ¶¶ 82, 95-96, 101-02. Therefore, Ms. Brunotte reasonably infers that Mr. Mannion's November 2006 disclosures to Mr. Brown of Privacy Act-protected information concerning GSA's investigation into Ms. Brunotte were the cause of GPO's withdrawal of its job offer to Ms. Brunotte.  Mr. Mannion's disclosures, and the resultant loss of her job at GPO, caused Ms. Brunotte to suffer severe emotional distress, which caused Ms. Brunotte to incur out-of-pocket pecuniary medical expenses, in the form of mileage to visit her physicians.  *See id.* at ¶ 108.  Ms. Brunotte further suffered pecuniary financial harms, such as her lost wages from her position at GPO and her

losses on sales of financial assets sold on disadvantageous terms due to financial hardship caused by her loss of her job at GPO.  *See id.*  The lost wages and other financial harms, as well as the emotional distress-related pecuniary expenses for mileage related to medical, clearly meet the standard of "adverse effect" standard.  *See Albright,* 732 F.2d at 186; *Gamble,* 567 F.Supp.2d at 156; *Rice,* 245 F.R.D. at 6.  Ms. Brunotte's lost wages from the loss of her job at GPO, as a claim with the associated remedy of back pay, clearly meet the *Cooper* standard for showing "actual damages."   *See Greenhouse v. Geren*, 574 F.Supp.2d 57, 69-70 (D.D.C. 2008) (Sullivan, J.); *Houston v. U.S. Dept. of the Treasury,* 494 F.Supp. 24, 30 (D.C.D.C. 1979) (Parker, J.); *cf. Doe,* 660 F.Supp.2d at 49.   Indeed, Defendant concedes that loss of a job could constitute actual damages (which also logically means conceding that loss of a job would meet the lower "adverse effect" standard as well).  *See* Defendant's Memorandum at 40.  Ms. Brunotte's out-of-pocket expenses for medical treatment-related mileage also meet the *Cooper* threshold for "actual damages".  *See Albright,* 558 F.Supp. at 264 , *aff'd on other grounds* 732 F.2d 181; *Houston,* 494 F.Supp. at 30, 30 fn.13; *see also Mitchell,* 883 F.2d at 452-53.

Defendant attempts to assert that causation is not shown for Ms. Brunotte's "actual damages", in that Mr. Schweickhardt was not physically shown the documents faxed by Mr. Mannion to Mr. Brown on November 21, 2006.  *See* Defendant's Memorandum at 41-42.  Defendant's argument is both legal and factual error.  Legally, the courts draw no distinction in terms of a Privacy Act  wrongful disclosure cause of action between disclosures of the physical papers in a Privacy Act system of records and disclosure of the incorporeal information derived from the documents in that system of records.   *See Doe,* 317 F.3d 339; *Krieger,* 211 F. 23d 134; *Bartel,* 725 F.2d at 1408-09; *Chang* , 314 F. Supp. 2d at 41, 41 fn.2; *Pilon,* 796 F.Supp. at12.  Defendant's factual argument also fails, as evidence from both GPO as an entity and Mr.

Schweickhardt as an individual witness, indicates that the Privacy Act-protected information that GPO received from Mr. Mannion was the sole motivation behind GPO's rescission Ms. Brunotte's job offer. *See* Statement at ¶¶ 82, 96, 101-02.  Such causal evidence has been held sufficient to identify a genuine issue of fact as to a defendant's liability, requiring a trial to resolve and precluding summary judgment.  *See, e.g., Tijerina,* 821 F.2d at 798-99.

Therefore, Ms. Brunotte has shown that she has suffered an adverse effect from Defendant's disclosure of the GSA OIG Investigative Files on Ms. Brunotte to GPO, an adverse effect which caused Ms. Brunotte to suffer actual damages.   In the alternative, a genuine issue of material fact exists as to whether Defendant's violation of the Privacy Act caused Ms. Brunotte an adverse effect and actual damages, raising credibility issues requiring a trial to resolve.

## IV.   Summary Judgment for GSA Should Be Denied On Ms. Brunotte's Fourth Claim

### a.   Privacy Act Claim for Failure to Procure Information from Subject

"Section 552a(e)(2) of the Privacy Act requires federal agencies that maintain systems of records to 'collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs.'"5 U.S.C. § 552a(e)(2). The section was designed to ''discourage the collection of personal information from third party sources and therefore to encourage the accuracy of Federal data gathering.'' *Velikonja,* 362 F.Supp.2d at 19. "The point of the provision, however, is not to give the agency the option of choosing which source—the subject of the investigation or some third party—would provide the most accurate information; rather, it reflects congressional judgment that the best way to ensure accuracy in general is to require the agency to obtain information 'directly from the individual whenever practicable.'"   *Thornburgh,* 888 F.2d at 874. "To obtain relief under subsection (e)(2) of the

Privacy Act, 5 U.S.C. § 552a(e)(2), a plaintiff must establish that: (1) the agency failed to elicit information directly from him "to the greatest extent practicable,"; (2) the violation of the Act was "intentional or willful,"; and (3) this action had an "adverse effect" on the plaintiff". *Thornburgh,* 888 F.2d at 872 (internal citations omitted); *accord Velikonja,* 362 F.Supp.2d at 19. "[T]he subjective thought processes of the investigator are irrelevant to the government's legal obligations under section (e)(2); the 'practicability' standard of that provision requires the government to act in a particular way, not to engage in a particular thought process." *See Brune v. Internal Revenue Serv.,* 861 F.2d 1284, 1288 (D.C.Cir. 1988).

### a. Defendant Failed to Obtain Information Directly From Ms. Brunotte to the Greatest Extent Practicable

It is beyond dispute that Defendant collected information regarding Ms. Brunotte, and did not collect that information from Ms. Brunotte.  In June 2006, Ms. Brunotte applied for a job with the U.S. Government Printing Office (GPO).  *See* Statement at ¶ 67.  Mr. Mannion (who worked for Defendant in GSA OIG), sought information and documents concerning the substance of Ms. Brunotte's job application, and contacted an employee of GPO, Nathaniel Brown (who worked in GPO OIG).  *See id. at* ¶¶ 54, 75-76.  Mr. Mannion's alleged goal in obtaining information regarding Ms. Brunotte's job application was to see if Ms. Brunotte had falsified portions of her application.  *See id.* at ¶ 78.  In asking Mr. Brown for Ms. Brunotte's application, Mr. Mannion made the allegation to Mr. Brown that Ms. Brunotte might have made a false statement in her application.  *See id.* at ¶ 79.  Mr. Mannion ultimately procured a copy of Ms. Brunotte's application from Mr. Brown at GPO.  *See id.* at ¶ 79.  At no time did Mr. Mannion ever contact Ms. Brunotte to request a copy of her application to work for GPO directly from her.  *See id.* at ¶¶ 86, 99.  At no time did Mr. Mannion ever contact Ms. Brunotte to discuss information appearing in Ms. Brunotte's application to work for GPO.  *See id.*   A full copy of

Ms. Brunotte's job application and all of her pre-appointment paperwork was readily available directly from Ms. Brunotte.  *See id.* at ¶ 69.   If Mr. Mannion feared that Ms. Brunotte would not voluntarily give him a copy of her application to work for GPO, GSA OIG, which possesses subpoena power, would have been readily able to procure a copy of Ms. Brunotte's job application from her.  *See id.* at ¶ 87.  GSA OIG did not prohibit Mr. Mannion from seeking Ms. Brunotte's GPO application from Ms. Brunotte herself.  *See id.*

Defendant could have practicably procured the information it sought concerning Ms. Brunotte's application to work for GPO, even despite its allegations that Ms. Brunotte had potentially falsified that application.  Defendant's alleged rationale for seeking information concerning Ms. Brunotte's application to work for GPO, in part, was that Mr. Mannion allegedly believed that Ms. Brunotte might have falsified her GPO job application.  *See* Statement at ¶ 78.  However, the courts in this Circuit have held that mere doubt about the subject's credibility does not excuse a federal agency from its obligation to collect information to the greatest extent practicable directly from the subject. "[T]he fact that plaintiff was suspected of false statements does not excuse the [agency] from seeking information from her directly."  *Velikonja,* 362 F.Supp.2d at 22.  "Courts have not articulated a precise definition of when it becomes 'impracticable' to seek information from the subject individual. [… However, t]he fact that the agency had 'justifiable grounds for doubting [the employee's] credibility' did not mean that seeking information from him was 'impracticable' under the Act." *See id.,* 362 F.Supp.2d at 19 (quoting *Waters*, 888 F.2d at 873).  Further, the D.C. Circuit has reasoned that while an inquiring agency need not necessarily contact a subject individual *first* in appropriate circumstances, the obligation to collect information to the greatest extent practicable directly from the subject does require that the subject be contacted *at some point* in the inquiry.  *See Hubbard v. Environmental*

*Protection Agency,* 809 F.2d 1, 6 fn.8 (D.C.Cir. 1987).  However, Mr. Mannion never contacted Ms. Brunotte regarding her application to work for GPO, even *after* he spoke with Mr. Brown at GPO in November 2006.  *See* Statement at ¶¶ 86, 99.

The information that Defendant sought from GPO—the contents of Ms. Brunotte's job application to GPO—could practicably have been recovered from Plaintiff, as it was the contents of an objective written document.  The substance of Ms. Brunotte's application was fixed in written form, and so was susceptible to objective analysis.  *See* Statement at ¶ 85. "In the context of an investigation that is seeking objective, unalterable information, reasonable questions about a subject's credibility cannot relieve an agency from its responsibility to collect that information first from the subject."  *Thornburgh,* 888 F.2d at 873.  Any of Defendant's alleged concerns regarding Ms. Brunotte's credibility could be further mitigated by the fact that the entire substance of Ms. Brunotte's job application was subject to ready verification.  The substance of all narrative portions of Ms. Brunotte's application--specifically, her resume and her statement concerning her qualifications (so-called 'KSA' statements)—were independently verifiable by Defendant from its own records, as Ms. Brunotte had transmitted those narratives to GPO using Defendant's own e-mail system.  *See* Statement at ¶ 85.  All other portions of Ms. Brunotte's job application consisted of documents which were either directly issued by government agencies other than Defendant or GPO (or else could be directly corroborated by those attached objective records).  *See id.*  The D.C. Circuit instructs that when such objective records are readily available from the subject, the ease in practicably procuring the information from the subject trumps any alleged agency concerns as to the subject's credibility in terms of deciding whether the agency has met its Privacy Act burden of procuring information from the subject to the greatest extent practicable.  *See Thornburgh,* 888 F.2d at 875.  Indeed, an agency violates 5

U.S.C. § 552a(e)(2) by even making a further inquiry with the third party to 'verify' the information received from the subject. *See id.* at 873 fn.6. Further, the courts have held that where such objective records are available from both the subject and a third party, the records should be procured from the subject. *See Velikonja,* 362 F.Supp.2d at 20.

Even if Ms. Brunotte's application was, *arguendo,* not a fixed objective record, Ms. Brunotte was not in a position to coerce GPO to falsify any records it might have had regarding her application. While grounds for not seeking information from the subject individual may exist if there is a risk that the subject could coerce the third party information source into providing false information, that risk only applies if the subject is in a position to coercively threaten or pressure the 3rd party into providing false information. *See Waters,* 888 F.2d at 873-74; *accord Velikonja,* 362 F.Supp.2d at 19, 22.  No such risk could plausibly have been in evidence here: Ms. Brunotte was an IT manager, and thus not an individual with job-related coercive authority (such as a law enforcement officer or IRS auditor).  *See* Statement at ¶ 98.  Further, when Mr. Mannion contacted GPO, Ms. Brunotte was still employed by GSA, and thus not a GPO employee with the managerial authority to coerce.  *See id.*   Therefore, Defendant failed to meet its Privacy Act obligation to collect information to the greatest extent practicable directly from the Ms. Brunotte regarding the contents of her GPO job application. In the alternative, a genuine issue of material fact exists as to whether Defendant violated the Privacy Act through its failure to collect information to the greatest extent practicable directly from the Ms. Brunotte regarding the contents of her GPO job application, raising credibility issues requiring a trial to resolve.

### b.  Defendant's Failure to Obtain Information About Ms. Brunotte's  Job Application Directly From Ms. Brunotte was Intentional or Willful

The evidence indicates that Defendant's failure to collect information to the greatest extent practicable directly from the Ms. Brunotte regarding her application to work for GPO was

intentional or willful.   Defendant's choice to seek information from GPO rather than Ms. Brunotte was not inadvertent.   Mr. Mannion worked for GSA OIG, an office with subpoena authority which could have been used to secure a copy of the application directly from Ms. Brunotte, assuming a simple request for the information was insufficient.   *See* Statement at ¶ 87. Mr. Mannion was not prohibited from seeking a copy of the application from Ms. Brunotte by any GSA OIG rules.   *See id.*   However, Mr. Mannion made no attempt to contact Ms. Brunotte concerning her job application to GPO at any time.   *See id.* at ¶¶ 86, 99.   Instead of contacting Ms. Brunotte, Mr. Mannion called Mr. Brown at GPO—an individual with whom he had never worked on cases, who Mr. Mannion had only met at a training conference, and with whom Mr. Mannion had not apparently spoken in some time (perhaps as long as a year or more).   *See id.* at ¶ 75.   Mr. Mannion's information request for Ms. Brunotte's job application was highly specific, and sought no information or documents from GPO other than those tied to Ms. Brunotte's application.   *See id.* at ¶¶ 75, 78-79.   These facts indicate that Mr. Mannion's request to seek information on Ms. Brunotte's job application from GPO rather than Ms. Brunotte was deliberate and not inadvertent.   Further, Mr. Mannion's decision to collect information from GPO rather than Ms. Brunotte was not the result of deliberations between Defendant's agents; instead, Mr. Mannion contacted GPO without notifying his supervisors first.   *See id.* at ¶¶ 54, 88.

The evidence further indicates pretext in Defendant's decision to contact GPO rather than Ms. Brunotte to collect information concerning Ms. Brunotte's GPO job application.   Mr. Mannion admitted that, when he called Mr. Brown, he (Mr. Mannion) possessed no factual evidence which indicated that Ms. Brunotte had falsified her GPO job application.   *See* Statement at ¶ 83.   Indeed, Mr. Mannion admitted that, at the time of his first call to Mr. Brown, he (Mr. Mannion) did not even possess sufficient evidence to form the opinion that Ms. Brunotte

might have falsified her GPO job application. *See id.* Further, when he called Mr. Brown, Mr. Mannion apparently had no specific knowledge of what questions GPO asked on the relevant job application, and therefore did not have specific information that GPO asked Ms. Brunotte any questions that she would have been even likely to have falsified. *See id.* at ¶ 84.

Further evidence of pretext can be found in Mr. Mannion's chosen point of contact at GPO. The sole person that Mr. Mannion contacted at GPO concerning Ms. Brunotte's job application was Mr. Brown, who Mr. Mannion had only met at a training conference and had never worked together on a case. *See* Statement at ¶¶ 75, 82. Mr. Brown worked in GPO OIG, not GPO's personnel office, and was not the likely custodian of records for Ms. Brunotte's application. *See id.* at ¶ 76. Indeed, when Mr. Mannion called Mr. Brown, Mr. Brown was not even aware that Ms. Brunotte had applied to GPO, and he had to check with others to find Ms. Brunotte's application. *See id.* Further, Mr. Brown's duties did not center around investigating job applicants; Ms. Brunotte's application was the first time dealing with alleged false statements in a job application despite having been a special agent for over 1 ½ years. *See id.* at ¶ 77.

Additional evidence of pretext can be found in the substance of Mr. Mannion's communications with Mr. Brown and Mr. Drugley. Mr. Mannion only contacted Mr. Brown at GPO concerning Ms. Brunotte's job application after he (Mr. Mannion) was informed of that application by Mr. Drugley. *See* Statement at ¶ 72. In that conversation, Mr. Drugley told Mr. Mannion that he was upset that Ms. Brunotte had not been sent to jail, fired or otherwise barred from the civil service, because of an alleged travel voucher falsification. *See id.* Mr. Mannion then contacted Mr. Brown at GPO within roughly a day of his (Mr. Mannion's) conversation with Mr. Drugley, without conferring with his supervisors first, and without ever contacting Ms. Brunotte herself to discuss her application. *See id.* at ¶¶ 72, 75, 86, 88, 99. When Mr. Mannion

contacted Mr. Brown, he told Mr. Brown that Ms. Brunotte had potentially falsified her application to work for GPO, even though he had no evidence indicating that such a falsification had actually occurred, no evidence to even form an opinion that such a falsification had occurred, and apparently no specific information that any of the questions actually asked by GPO would have prompted a falsification.  *See id.* at ¶¶ 79, 83-84.  Accordingly, the evidence shows that Mr. Mannion's failure to collect information to the greatest extent practicable directly from Ms. Brunotte concerning her GPO job application meets the "intentional or willful" standard.

Thus, the Court should find that Defendant willfully and intentionally violated the Privacy Act, 5 U.S.C. § 552a(e)(2), when Defendant's agent, Kerry Mannion, contacted an agent of the Government Printing Office in November 2006 to obtain information about what Ms. Brunotte provided in her job application to work for GPO without first attempting to obtain that information from Ms. Brunotte. In the alternative, the Court should find that a genuine issue of material fact exists as to whether Defendant's violations of the Privacy Act were intentional and willful, raising credibility issues requiring a trial to resolve.

### c. Plaintiff Suffered An Adverse Effect and Actual Damages from Defendant's Failure to Obtain Information Directly From Ms. Brunotte

In this case, Ms. Brunotte has met both the "adverse effect" and "actual damages" standards with regard to Mr. Mannion's failure to collect information from her directly to the greatest extent practicable concerning her job application to work for GPO.  The record shows that, but for Mr. Mannion's excuse of needing to procure information concerning Ms. Brunotte's application from GPO, he would have lacked any business reason for contact GPO whatsoever concerning Ms. Brunotte.  *See* Statement at ¶¶ 78, 86.  Until Mr. Mannion contacted Mr. Brown, GPO had no investigation pending into Ms. Brunotte, and had in fact given her a job offer.  *See id.*  at ¶¶ 68, 90-91.  Therefore, Ms. Brunotte reasonably infers that, but for Mr. Mannion's

failure to collect information from her directly to the greatest extent practicable concerning her job application to work for GPO, Mr. Brown and GPO would never have received the information which led to Ms. Brunotte's loss of her job at GPO. Where issues of causation are in play between various torts by the same defendant, summary judgment is inappropriate as the causation issue of which tort gave rise to the damages is best resolved at trial. *See Boyd,* 335 F.Supp.2d at 29. Mr. Mannion's failure to collect information from her directly to the greatest extent practicable concerning her job application to work for GPO, and the resultant loss of her job at GPO, caused Ms. Brunotte to suffer severe emotional distress, which caused Ms. Brunotte to incur out-of-pocket pecuniary medical expenses, in the form of mileage to visit her physicians. *See id.* at ¶ 108. Ms. Brunotte further suffered pecuniary financial harms, such as her lost wages from her position at GPO and her losses on sales of financial assets sold on disadvantageous terms due to financial hardship caused by her loss of her job at GPO. *See id.* The lost wages, other financial harms, and mileage related to medical treatment clearly meet the standard of "adverse effect" standard. *See Albright,* 732 F.2d at 186; *Gamble,* 567 F.Supp.2d at 156; *Rice,* 245 F.R.D. at 6. Ms. Brunotte's lost wages from the loss of her job at GPO, as a claim with the associated remedy of back pay, clearly meet the *Cooper* standard for showing "actual damages." *See Geren,* 574 F.Supp.2d at 69-70; *Houston,* 292 F.Supp at 30; *cf. Doe,* 660 F.Supp.2d at 49. Defendant concedes that loss of a job could constitute actual damages. *See* Defendant's Memorandum at 40. Ms. Brunotte's out-of-pocket expenses for mileage also meet the *Cooper* "actual damages" threshold. *See Albright,* 558 F.Supp. at 264, *aff'd on other grounds* 732 F.2d 181; *Houston,* 494 F.Supp. at 30, 30 fn.13; *see also Mitchell,* 883 F.2d at 452-53.

Therefore, Ms. Brunotte has shown that she has suffered an adverse effect from Defendant's failure to collect information from her directly to the greatest extent practicable

concerning her GPO job application, an adverse effect which caused Ms. Brunotte to suffer actual damages.   In the alternative, a genuine issue of material fact exists as to whether Defendant's violation of the Privacy Act caused Ms. Brunotte an adverse effect and actual damages, raising credibility issues requiring a trial to resolve.

## V.      Defendant's Motion Should be Denied or Deferred in Adjudication Because Expert Discovery on Psychological Damages Causation Issues is Incomplete

Defendant's Motion for Summary Judgment should be denied—or, in the alternative, the Court's consideration of Defendant's Motion should be deferred to allow Plaintiff time for additional discovery—because discovery in this matter is incomplete.   Under Federal Rule of Civil Procedure 56(d)' "If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order."   "'[T]he purpose of Rule 56(f)[13] is to prevent 'railroading' the non-moving party through a premature motion for summary judgment before the non-moving party has had the opportunity to make full discovery.'"   *Bancoult v. McNamara*, 217 F.R.D. 280, 282 (D.D.C. 2003) (internal citations omitted).   "A party making a Rule 56(f) request must 'state[ ] concretely' why additional discovery is needed to oppose a motion for summary judgment."   *See Messina v. Krakower*, 439 F.3d 755, 762 (D.C. Cir. 2006). In order to prevail on a Rule 56(f) request, a "party must show a reasonable basis to suggest that discovery would reveal triable issues of fact" and must indicate why he cannot yet produce those facts.   *Bancoult*, 217 F.R.D. at 283; *see Williams v. Fed. Nat. Mortgage Assn.*, Civil Action No. 05-1483(JDB), 2006 WL 1774252 (D.D.C. June 26, 2006) at *11.   "Rule 56(f) motions should

---

[13]      Before the 2010 amendments, present Rule 56(d) was codified as Rule 56(f).   *See* Committee Notes to 2010 Amendments to the Federal Rules of Civil Procedure for Rule 56 at "Subdivision (d)", *available at* http://www.law.cornell.edu/rules/frcp/rule_56.

be granted 'almost as a matter of course unless the non-moving party has not diligently pursued discovery of the evidence.'" *Berkeley v. Home Ins. Co.,* 68 F.3d 1409, 1414 (D.C. Cir. 1995).

In the instant matter, the Court bifurcated discovery.  Specifically, by Minute Order dated March 14, 2011, the Court stayed expert witness discovery.  Prior to this Order, Plaintiff had pursued discovery concerning Defendant's expert witnesses, for example through filing interrogatories and document requests seeking information concerning Defendant's expert witnesses.  *See* Exhibit 62 at 6-7, 27-29 (Interrogatory 1; Document Requests 8, 18).  Pursuant to that Order, the parties' discovery on expert witnesses is not complete.  *See* Exhibit 59 at ¶ 3.  Of particular note, both parties have identified psychological expert witnesses for this case, for purposes of forensically assessing the extent to which Plaintiff's psychological and emotional injuries as caused by Defendant incapacitated Plaintiff from seeking further employment for purposes of assessing liability for equitable relief such as back pay and front pay.  *See id.* at ¶ 4.  As a result, Plaintiff has been barred from deposing Defendant's psychological expert, not from lack of diligence, due to the March 14, 2011 Order.  *See id.* at ¶ 5.

Mindful of this March 14, 2011, Order bifurcating discovery, Plaintiff excluded argument concerning the 'adverse effect/actual damages' prong of her Privacy Act claims from her Motion for Partial Summary Judgment in the instant matter.  *See, e.g.* Plaintiff's Motion for Partial Summary Judgment at 1 fn.1.  However, Defendant included argument on 'adverse effect/actual damages' issues in its Motion for Summary Judgment.  *See, e.g.,* Defendant's Memorandum at 6-9, 40-42.  More particularly, Defendant's Motion specifically challenges Plaintiff's showing of causal connection between Defendant's disclosures and Plaintiff's emotional and psychological injuries (and thus the related pecuniary expenses associated with those injuries, such as lost wages and out of pocket costs for medical treatment).  *Compare id.* at 6-7 *to* Statement at ¶¶ 52,

44

108.   Plaintiff believes that that she would need the results of completed expert witness discovery—in particular, the deposition of Defendant's psychological expert witness—to be able to present the facts needed to be able to argue whether the Plaintiff has established Defendant's causation of Plaintiff's psychological and emotional injuries as caused by Defendant, in particular as to how those injuries incapacitated Plaintiff from seeking further employment for purposes of assessing Defendant's liability for equitable relief such as back pay and front pay. *See* Exhibit 59 at ¶ 6.  For these reasons, the Court should either deny Defendant's Motion as to 'adverse effect/actual damages' issues, or in the alternative should defer consideration of Defendant's Motion until Plaintiff has the opportunity to complete discovery (in particular, the deposition of Defendant's psychological expert witness).

## VI.   Conclusion

For the reasons stated above, the Court should deny Defendant's motion for summary judgment and/or defer consideration of Defendant's motion for summary judgment to permit completion of expert witness discovery.

Respectfully submitted,

/s/ Joseph V. Kaplan

JOSEPH V. KAPLAN
D.C. BAR # 347344
ANDREW J. PERLMUTTER
D.C. BAR # 489601
PASSMAN & KAPLAN, P.C.
1828 L Street NW, Suite 600
Washington, D.C. 20036
(202) 789-0100

Attorneys for the Plaintiff

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

REBECCA A. BRUNOTTE,                    )
        Plaintiff,                    )
                          )    **Civil Action No.  08-0587 (FJS)**
      **V.**                    )
                          )    **ECF**
DANIEL M. TANGHERLINI,                    )
**Acting Administrator, General Services**    )
**Administration,**                    )
           **Defendant.**                    )
_____    )

**STATEMENT OF DISPUTED MATERIAL FACTS AND GENUINE ISSUES**

Plaintiff, by and through her undersigned counsel and pursuant to L.Cv.R. 7(h)(1), respectfully submits the following statement of disputed material facts and genuine issues in support of her opposition to Defendant's motion for summary judgment in the above-captioned matter.  To the extent that any discrepancy exists between the Defendant's Motion and its associated statement of facts and the substance of this Statement of Disputed Material Facts and Genuine Issues, Plaintiff controverts Defendant's statement of material facts.  Plaintiff submits that those facts are in dispute, and severally and collectively constitute genuine issues of material fact which can only be adjudicated through credibility determinations and fact-finding for which a hearing is required.

1.      In connection with her then-pending informal EEO complaint against Defendant General Services Administration (later identified by Defendant as Agency Complaint No. 06COFTARB-1), Plaintiff Rebecca Brunotte was interviewed by EEO Counselor Joy Savage.[1]  _See_ Exhibit 16

---

[1]      Ms. Savage was not a direct employee of Defendant, but instead worked as a contractor. _See_ Exhibit 2 (Excerpt from EEO Report of Investigation from _Brunotte v. Administrator General Services Administration,_ Case No. 06-COFTSRB-1, compiled by EEO Investigator

1

(Excerpt from Plaintiff's original verified responses to Defendant's interrogatories) at 2-6.  Ms. Savage compiled written notes of this interview, which she then provided to Ms. Brunotte for correction.  *See id.*  Ms. Brunotte edited these notes, and sent the revised notes back to Ms. Savage on December 5, 2005 as an e-mail file attachment.  *See id.;* Exhibit 17 (December 5, 2005 e-mail from Plaintiff to Ms. Savage with file attachment).

2.      EEO Counselor Joy Savage's interview of Ms. Brunotte was conducted (and Ms. Savage's notes thereof were compiled) in connection with Defendant General Services Administration's pre-complaint counseling of Ms. Brunotte's then-informal complaint of sex discrimination under Title VII of the Civil Rights Act of 1964.  *See, e.g.,* Exhibit 2 (Excerpt from EEO Report of Investigation from *Brunotte v. Administrator General Services Administration,* Case No. 06-COFTSRB-1, compiled by Investigator Tamara H. Lindquist and dated October 18, 2006 ("EEO ROI"), Vol. 1, Ex. 3 [the EEO Counselor's Report compiled by Ms. Savage]) at 15-17.[2]  The record of that interview accordingly was subject to the EEOC/GOVT-1 Privacy Act system of records. *See* Exhibit 36 (relevant Privacy Act system of records notices), 67 Fed.Reg. 49,354-355 (July 30, 2002).

3.      Ms. Savage provided a copy of the notes from her interview of Ms. Brunotte to Casey Coleman.  *See* Exhibit 18 (December 27, 2005, e-mail from Ms. Savage to Plaintiff, stating that "I have an interview summary out to Casey Coleman").  At that time, Ms. Coleman was Ms. Brunotte's first-line supervisor, and was one of two Responding Management Officials (RMOs)

---

Tamara H. Lindquist and dated October 18, 2006 ("EEO ROI"), Vol. 1, Ex. 3 [the EEO Counselor's Report compiled by Ms. Savage]) at 15, 36-37.

[2]      All page number citations to Report of Investigation (originally collated into three volumes) other than to the Investigator's Summary (Exhibit 1 to this Statement) are cited to the consecutive pagination for all exhibits in the ROI and not to the internal pagination for any exhibit or to the pages excerpted for the exhibits attached to this Statement.

2

in Ms. Brunotte's EEO complaint.  *See* Exhibit 1 (Excerpt from ROI EEO Investigator's summary) at 3-4; Exhibit 2 at 17, 26-35; Exhibit 39 (Transcript of First Deposition of Roland Ben) at 17-18.  During the December 2005 timeframe, Ms. Coleman and Ms. Brunotte worked in Defendant's Office of Chief Information Officer for the Federal Acquisition Service (CIO), whose programmatic focus was information technology and related technology and telephony issues.  *See, e.g.,* Exhibit 2 at 17, 26; Exhibit 4 (Excerpt from EEO ROI, Vol. 2, Ex. 7) at 475.

4.     Ms. Coleman disclosed these Brunotte interview notes to John Geist on December 13, 2011, in an e-mail bearing the subject line "RB EEO Complaint Interview", a fact confirmed by Mr. Geist in his testimony.  *See* Exhibit 6 (Excerpt from EEO ROI, Vol. 2, Ex. 12) at 565, 571-72; Exhibit 7 (EEO ROI, Vol. 2, Ex. 12-I) at 576-86.  Ms. Coleman admitted sending this e-mail, which contained a copy of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte, to Mr. Geist.  *See* Exhibit 11 (Excerpt from Casey Coleman deposition transcript) at 45, 49-50, 56-58.  At deposition, Mr. Geist recalled receiving a disclosure from Ms. Coleman concerning Ms. Brunotte's EEO complaint.  *See* Exhibit 12 (Excerpt from John Geist deposition transcript) at 16-17.  At the time of Ms. Coleman's December 2005 disclosures, Mr. Geist was an information technology (IT) manager in CIO and a peer of Ms. Brunotte. *See* Exhibit 4 at 475; Exhibit 6 at 564; Exhibit 12 at 10-12, 50-51.  The text of the document produced by Ms. Coleman to Mr. Geist is identical to what Ms. Brunotte reviewed and sent to Ms. Savage on December 5, 2005.  *Compare* Exhibit 17 *to* Exhibit 7 at 577-86.

5.     Ms. Coleman also disclosed a copy of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte to Gary Drugley; Mr. Drugley testified that Ms. Coleman also sent him this e-mail attachment containing the text of an interview between Ms. Brunotte and the

3

EEO counselor.  *See* Exhibit 5 (Excerpt from EEO ROI Vol. 2, Ex. 9) at 541.  Ms. Coleman admitted sending this e-mail, which contained a copy of EEO Counselor Joy Savage's notes of her interview with Ms. Brunotte, to Mr. Drugley.  *See* Exhibit 11 at 45, 49, 57-58.  Mr. Drugley received Ms. Coleman's disclosure.  *See* Exhibit 13 (Excerpt from Gary Drugley deposition transcript) at 71-73.  At the time of Ms. Coleman's December 2005 disclosures, Mr. Drugley was an IT manager in CIO, with the title of Associate Chief Information Officer. [3]  *See* Exhibit 4 at 475; Exhibit 5 at 532; Exhibit 13 at 15, 17-18.  Mr. Drugley and Mr. Geist testified to discussing the substance of Ms. Brunotte's EEO counseling interview with each other.  *See* Exhibit 5 at 541*;* Exhibit 6 at 572.   Mr. Drugley admitted to Mr. Geist that he wrote the response to Ms. Brunotte's EEO complaint at the counseling phase.  *See* Exhibit 8 (EEO ROI, Vol. 2, Ex. 14) at 631.  To accomplish this, Ms. Coleman produced to Mr. Drugley a copy of the EEO counselor's notes from the EEO counselor's interview with Ms. Brunotte, an action documented in an e-mail produced to the Investigator.  *See* Exhibit 9 (Excerpt from EEO ROI, Vol. 3, Ex. 20) at 792.  Ms. Coleman admitted to making this disclosure to Mr. Drugley.  *See* Exhibit 4 at 508.  As part of Mr. Drugley's preparation of a draft counseling-stage response for Ms. Coleman, he prepared a very detailed responsive draft document draft, which was forwarded to Ms. Coleman by e-mail attachment.  *See* Exhibit 10 (Excerpt from EEO ROI, Vol. 3, Ex. 29) at 919-20.  Ms. Coleman then forwarded this document as an e-mail attachment to Mr. Drugley, Cecelia Brown Lane, and

---

[3]      While Mr. Drugley allegedly later took over administrative assistant duties from Ms. Lane, Ms. Lane was still performing those duties at the time of Ms. Coleman's disclosure of the EEO Counselor's notes from Ms. Brunotte's interview in December 2005.  *See* Exhibit 5 at 532; Exhibit 13 at 17-18; Exhibit 14 at 12-16.  Mr. Drugley further testified that he was still performing the duties of assistant chief information officer up through the time of Ms. Brunotte's departure from GSA, and that he had not yet become an executive specialist.  *See* Exhibit 13 at 17-18.  Based on these facts, Plaintiff reasonably infers that Mr. Drugley was not serving as an administrative assistant or executive specialist to Ms. Coleman at the times of Ms. Coleman's disclosure to Mr. Drugley.

Mr. Geist on December 15, 2005. *See* Exhibit 10 at 919-42; Exhibit 11 at 48-53, 55-56. Mr. Drugley, Ms. Lane, and Mr. Geist were all e-mail recipients of Ms. Coleman's disclosure. *See* Exhibit 10 at 919-42; Exhibit 11 at 57-58.

6.      Mr. Geist and Mr. Drugley further conferred regarding the substance of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte, as disclosed to them by Ms. Coleman. Mr. Drugley and Mr. Geist testified to discussing the substance of Ms. Brunotte's EEO counseling interview with each other. *See* Exhibit 5 at 541*;* Exhibit 6 at 572. Further, as part of Gary Drugley's preparation of a draft counseling-stage response for Ms. Coleman, he prepared a very detailed responsive draft document draft, which was forwarded to Ms. Coleman by e-mail attachment; the text of this transmittal e-mail, Mr. Drugley noted that Mr. Geist had provided input. Exhibit 10 at 919-20 ("I have John's edits of the detail notes.").

7.      Ms. Coleman admitted sending an e-mail message containing a copy of the EEO counselor's interview notes of Ms. Savage's with Ms. Brunotte, to Cecelia Brown Lane.[4] *See* Exhibit 11 at 45, 49, 56-58. Ms. Lane was a contractor performing secretarial duties in CIO. *See* Exhibit 5 at 532; Exhibit 13 at 74; Exhibit 14 (Excerpt from Cecelia Brown Lane deposition transcript) at 10-16. Mr. Drugley, Ms. Lane, and Mr. Geist were all e-mail recipients of Ms. Coleman's disclosure. *See* Exhibit 10 at 919-42; Exhibit 11 at 57-58. At deposition, Ms. Lane could not specifically recall if she had received Ms. Coleman's disclosure in December 2005, but testified that it was "totally possible" that she had received it. *See* Exhibit 14 at 20-23. Based on these facts, Plaintiff reasonably infers that Ms. Coleman actually disclosed a copy of the EEO

---

[4]      At the time of the relevant incidents, Cecelia Brown Lane was known as Cecelia Brown. *See, e.g.,* Exhibit 14 (Excerpt from Cecelia Brown Lane deposition transcript) at 20; Exhibit 11 (Excerpt from Casey Coleman deposition transcript) at 45, 85.

counselor's interview notes of Ms. Savage's with Ms. Brunotte, to Cecelia Brown Lane in December 2005.  Ms. Lane further testified that she did not recall Ms. Coleman ever asking her to assist in responding to Ms. Brunotte's EEO allegations or to ever asking Ms. Lane to verify dates of meeting or occurrences in connection with Ms. Brunotte's EEO complaint.  *See* Exhibit 14 at 23-24.  Ms. Lane testified that she had no clear recollection on whether or not she opened the attachment, but stated that she was unable to definitively state that she had not opened the attachment.  *See* Exhibit 14 at 61, 73-74.  Based on these facts, Plaintiff reasonably infers that Ms. Lane opened the attachment containing a copy of the EEO counselor's interview notes of Ms. Savage's with Ms. Brunotte.

8.      Ms. Brunotte never gave any consent to either Ms. Savage or Ms. Coleman to disclose the notes of Ms. Savage's interview of her to Mr. Geist, Mr. Drugley, Ms. Lane or Mr. Bolster.  *Cf.* Exhibit 3 (Excerpt from EEO ROI, Vol. 1, Ex. 6) at 100; Exhibit 15 (Excerpt from Rebecca Brunotte deposition transcript) at 57-63; First Amended Complaint in the instant matter at 12.

9.      Ms. Coleman never sought permission from EEO counselor Joy Savage to provide Ms. Brunotte's EEO complaint interview summary to other people.  *See* Exhibit 11 at 48.  The EEO Counselor did not provide Ms. Coleman instructions on whether Ms. Coleman was authorized to disclose the summary of Ms. Brunotte's interview by the EEO Counselor to other people.  *See id.*

10.     Ms. Savage did not directly identify Mr. Geist, Mr. Drugley, Ms. Lane or Mr. Bolster as witnesses, demonstrated by the fact that she did not interview them during her pre-complaint EEO counseling process.  *See* Exhibit 2.

11.     Ms. Coleman testified that, when Privacy Act issues arose during the December 2005 timeframe, her general practice was to confer with Defendant's general counsel or human resources offices to seek case-by-case guidance when the situation called for it.  *See* Exhibit 11 at 41-42.  Ms. Coleman further testified that although she had sought advice on how generally to proceed once she had learned of the existence of Ms. Brunotte's EEO complaint against her, she never specifically asked about the extent to which it was permissible for her to disclose Ms. Brunotte's EEO allegations.  *See id.* at 44.

12.     Ms. Coleman used her non-GSA personal e-mail account on the Yahoo! e-mail service to transmit e-mails containing all or part of EEO Counselor Joy Savage's notes of her interview of Ms. Brunotte.  *See* Exhibit 7 at 576; Exhibit 10 at 919-42; Exhibit 11 at 57-60.  Ms. Coleman sent an e-mail containing all or part of the EEO counselor's summary of her interview of Ms. Brunotte not only to Ms. Lane's GSA e-mail account, but to Ms. Lane's personal Yahoo! e-mail account as well.  *See* Exhibit 10 at 919-20; Exhibit 13 at 74; Exhibit 14 at 19-20.  Ms. Coleman sent her December 13, 2005, e-mail to Mr. Geist containing the EEO Counselor's summary of her interview with Ms. Brunotte to Mr. Geist's personal, non-GSA e-mail account maintained by Comcast.  *See* Exhibit 6 at 571; Exhibit 7 at 576.

13.     Ms. Coleman also testified that forwarding GSA-held documents containing personally identifiable information to non-GSA e-mail accounts was contrary to GSA policy.  *See* Exhibit 11 at 60-62.

14.     Ms. Coleman wrote "Steve applauds you." in the body of her December 15, 2005 e-mail to Mr. Drugley, Ms. Lane, and Mr. Geist.  *See* Exhibit 10 at 919.  The statement "Steve applauds you" was in reference to the assistance Mr. Drugley provided Ms. Coleman in responding to Ms.

7

Brunotte's EEO allegations.  *See id.*; Exhibit 11 at 65-66; Exhibit 13 at 85.  The "Steve" that Ms. Coleman referred to was her husband, Steve Bolster, who was not a GSA employee.  *See* Exhibit 11 at 65-67; Exhibit 12 at 21-22; Exhibit 13 at 80-81; Exhibit 14 at 52; Exhibit 15 at 58-59.  Based on these facts, Plaintiff reasonably infers that Ms. Coleman disclosed either the actual EEO Counselor's summary of her interview with Ms. Brunotte to Mr. Bolster, or in the alternative reasonably infers that Ms. Coleman disclosed information referenced in that summary to Mr. Bolster.

15.    Mr. Geist, Mr. Drugley, Ms. Lane and Mr. Bolster were not attorneys or human resources specialists working for Defendant. Mr. Bolster did not work for GSA at all.  *See* Exhibit 11 at 65-67; Exhibit 12 at 21-22; Exhibit 13 at 80-81; Exhibit 14 at 52; Exhibit 15 at 58-59.   Ms. Lane was a contractor performing secretarial duties.  *See* Exhibit 5 at 532; Exhibit 13 at 74; Exhibit 14 at 10-16.  At the time of Ms. Coleman's December 2005 disclosures, Mr. Geist and Mr. Drugley[5] were IT managers.  *See* Exhibit 4 at 475; Exhibit 5 at 532; Exhibit 6 at 564.   During the December 2005 timeframe, Ms. Coleman, Ms. Brunotte, Ms. Lane, Mr. Geist and Mr. Drugley all worked in the office of Chief Information Officer, whose programmatic focus was IT and related technology and telephony issues (and not EEO or human resources matters).  *See, e.g.,* Exhibit 2 at 17; Exhibit 4 at 475.

---

[5]    While Mr. Drugley allegedly later took over administrative assistant duties from Ms. Lane, Ms. Lane was still performing those duties at the time of Ms. Coleman's disclosure of the EEO Counselor Joy Savage's notes from Ms. Brunotte's interview in December 2005.  *See* Exhibit 5 at 532; Exhibit 14 at 12-16.  Mr. Drugley further testified that he was still performing the duties of assistant chief information officer up through the time of Ms. Brunotte's departure from GSA, and that he had not yet become an executive specialist.  *See* Exhibit 13 at 17-18. Based on these facts, Plaintiff reasonably infers that Mr. Drugley was not serving as an administrative assistant or executive specialist to Ms. Coleman at the times of Ms. Coleman's disclosure to Mr. Drugley.

16.     Ms. Coleman was aware that the Brunotte interview summary which she provided to Ms. Lane, Mr. Geist and Mr. Drugley was related to Ms. Brunotte's pending EEO complaint.  *See* Exhibit 11 at 45, 55-56.  Mr. Drugley and Mr. Geist were aware that the documents Ms. Coleman provided them to review derived from Ms. Brunotte's then-pending EEO complaint. *See* Exhibit 13 at 72-73, 79; Exhibit 12 at 16-17; Exhibit 6 at 565, 571-72.

17.     Prior to providing the interview summary of Ms. Brunotte's interview by the EEO Counselor to Mr. Drugley, Ms. Coleman made no attempt to redact the statement so as to only produce to Mr. Drugley the portions of the interview summary about matters in which Mr. Drugley was personally involved or about which Mr. Drugley had personal knowledge.  *See* Exhibit 11 at 52-54.

18.     Prior to providing the interview summary of Ms. Brunotte's interview by the EEO Counselor to Ms. Lane, Ms. Coleman made no attempt to redact the statement so as to only produce to Ms. Lane the portions of the interview summary about matters in which Ms. Lane was named or about which Ms. Lane had firsthand knowledge.  *See* Exhibit 11 at 51.

19.     Prior to providing the interview summary of Ms. Brunotte's interview by the EEO Counselor to Mr. Geist, Ms. Coleman made no attempt to redact the statement so as to only produce to Mr. Geist the portions of the interview summary about matters in which Mr. Geist was named or about which Mr. Geist had personal knowledge.  *See* Exhibit 11 at 51.

20.     Ms. Coleman participated in annual online EEO training.  *See* Exhibit 11 at 41.  Ms. Coleman had exposure to the EEO process predating Ms. Brunotte's EEO complaint, Ms.

Coleman had been involved with a prior EEO complaint at GSA as a Responding Management Official (RMO).  *See id.* at 43-44.

21.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed to others by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman announced the names of contractors being cut due to budget cutbacks without consulting first with Ms. Brunotte, denying Ms. Brunotte the opportunity to propose alternatives as had been prior practice.  *See* Exhibit 7 at 577; Exhibit 10 at 924-25.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 577; Exhibit 10 at 924.  Neither Ms. Lane nor Mr. Geist had firsthand information to provide Ms. Coleman for drafting a response to Plaintiff's claim.  *See* Exhibit 14 at 26; Exhibit 12 at 23.

22.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman did not timely inform Ms. Brunotte of her being moved in an upcoming reorganization prior to publicly announcing the move at an April 2005 staff meeting and that doing so was an act of Ms. Coleman "showing her that she is the boss."  *See* Exhibit 7 at 577; Exhibit 10 at 925.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 577; Exhibit 10 at 925.  Ms.

10

Coleman admitted that Mr. Drugley, Ms. Lane, and Mr. Geist had no firsthand knowledge of what took place at this April 2005 meeting referenced in this allegation.  *See* Exhibit 11 at 72-73. Mr. Drugley stated at his deposition that he had no firsthand information of this meeting and no basis to assess whether Ms. Coleman's response to this allegation is accurate, inaccurate, complete, or incomplete.  *See* Exhibit 13 at 87-89.  Mr. Geist stated at deposition that he did not provide input to Ms. Coleman in responding to this allegation—and that Ms. Coleman had not asked him to provide input on this allegation.  *See* Exhibit 12 at 23-24.  Ms. Lane testified that she was not present at the April 2005 meeting and had no firsthand knowledge regarding the allegation.  *See* Exhibit 14 at 26-27.

23.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman informed Ms. Brunotte at Ms. Brunotte's annual appraisal session that her performance rating of '2' should not have come as a surprise.   *See* Exhibit 7 at 578-79; Exhibit 10 at 926-28.   Ms. Coleman also disclosed to Mr. Geist, Ms. Lane and Mr. Drugley her response to Ms. Brunotte's allegation which described counseling sessions Ms. Coleman had with Ms. Brunotte to improve Ms. Brunotte's performance, in particular discussing a meeting occurring on November 3, 2005.  *See* Exhibit 10 at 926-28.   Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Ms. Coleman admitted that Mr. Drugley, Ms. Lane, and Mr. Geist were not at the November 3, 2005 meeting and lacked firsthand knowledge of what transpired at that meeting. *See* Exhibit 11 at 81.  Ms. Lane and Mr. Geist were not expressly mentioned in this allegation.

*See* Exhibit 7 at 578-79; Exhibit 10 at 926-28.  Mr. Drugley stated at deposition that he had no firsthand knowledge of what occurred at the counseling sessions and no basis to state whether Ms. Coleman's response to this allegation was accurate, inaccurate, complete, or incomplete. *See* Exhibit 13 at 91-94.  Ms. Lane stated at deposition that she had no knowledge of what occurred during these meetings, could not have assisted Ms. Coleman in drafting a response to this allegation, and could not recall whether she had access to the annual appraisal.  *See* Exhibit 14 at 28-30, 34-35.  Mr. Geist stated at deposition that he had no firsthand knowledge of what took place during the annual performance appraisal session, no firsthand knowledge of any conversation between Ms. Coleman and Ms. Brunotte over performance issues, and no firsthand knowledge of what the performance appraisal criticized.  *See* Exhibit 12 at 26-28, 31-32.

24.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman informed her that her annual performance appraisal "disappeared."  *See* Exhibit 7 at 578; Exhibit 10 at 926.     Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 578; Exhibit 10 at 926.  Mr. Drugley stated at deposition that he had no firsthand knowledge of a conversation between Ms. Coleman and Ms. Brunotte over a lost performance appraisal and no basis to know whether Ms. Brunotte's response to this allegation is incorrect, correct, complete, or incomplete.   *See* Exhibit 13 at 93-94.  Ms. Lane stated at deposition that she had no knowledge of a conversation between Ms. Coleman and Ms. Brunotte over a lost performance

appraisal and could not have assisted Ms. Coleman in drafting a response to this allegation.  *See* Exhibit 14 at 30-31.  Mr. Geist also stated at deposition that he remembered the incident this allegation concerns, but otherwise had no firsthand knowledge of this issue and no information to provide Ms. Coleman to use in responding to this allegation as Ms. Brunotte was the one who told him about the incident.  *See* Exhibit 12 at 28.

25.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman denied Ms. Brunotte's request for reconsideration on her performance evaluation.  *See* Exhibit 7 at 578-79; Exhibit 10 at 927.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53. However, Ms. Lane and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 578-79; Exhibit 10 at 927.  Ms. Lane stated at deposition that she had no firsthand knowledge of this request and could not have assisted Ms. Coleman in drafting a response to this allegation. *See* Exhibit 14 at 31-32.

26.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman denied that "any sort of 'file'" was kept on Ms. Brunotte. *See* Exhibit 7 at 578-79; Exhibit 10 at 927.   Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Ms. Lane and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 578-79; Exhibit 10 at

13

927.   Ms. Lane claimed to have no firsthand knowledge of this discussion between Ms. Coleman and Ms. Brunotte.  *See* Exhibit 14 at 33.

27.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Brunotte provided Ms. Coleman with a list of accomplishments that "targeted results to the highest level of the plan (5 rating)", which Ms. Coleman then ignored in giving Ms. Brunotte a "2" rating.   *See* Exhibit 7 at 578-79; Exhibit 10 at 928-29.      Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.   However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 579; Exhibit 10 at 929.    Ms. Lane stated at deposition that she had no firsthand knowledge of what transpired between Ms. Coleman and Ms. Brunotte with respect to Ms. Brunotte giving Ms. Coleman this list.  *See* Exhibit 14 at 35-36. Mr. Geist stated at deposition that he was not a participant in the effort by Ms. Brunotte to provide Ms. Coleman this list and was not a party to the conversation between Ms. Brunotte and Ms. Coleman with respect to the list, although Ms. Brunotte may have independently provided him a copy of the list.  *See* Exhibit 12 at 32-33.

28.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman did not review a "Year in Review" report which Ms. Brunotte composed and provided to Ms. Coleman.  *See* Exhibit 7 at 579-80; Exhibit 10 at 929-30.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the

14

allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  Ms. Coleman also stated at deposition that, at the time of the disclosure, she did not believe or understand either Ms. Lane or Mr. Geist to have firsthand knowledge of the content of the Year in Review report.  *See* Exhibit 11 at 81-84.  Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 579-80; Exhibit 10 at 929-30.  In her deposition, Ms. Lane denied having any firsthand knowledge of matters relating to the Year in Review report and stated that she could not have assisted Ms. Coleman in preparing a response to this allegation.  *See* Exhibit 14 at 36-37.  Mr. Geist stated at deposition that he did not recall whether he had firsthand information concerning the Year in Review report, and that he did not review the report.  *See* Exhibit 12 at 33-34.

29.    The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman sent her an e-mail prior to her mid-year review stating there were "serious issues to discuss," but that when Ms. Coleman actually met with Ms. Brunotte no such negative comments on Ms. Brunotte's performance were forthcoming.  *See* Exhibit 7 at 580-82; Exhibit 10 at 930, 933.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 580-82; Exhibit 10 at 930, 933.  At deposition Ms. Coleman admitted that Mr. Drugley, Ms. Lane, and Mr. Geist did not have firsthand knowledge of what occurred at this mid-year progress review.  *See* Exhibit 11 at 84-86.  Mr. Drugley confirmed at deposition that he had no firsthand knowledge of what took

place during this mid-year review and no basis to know whether Ms. Coleman's response to this allegation is accurate, inaccurate, correct, or incorrect.  *See* Exhibit 13 at 95-96.  Ms. Lane and Mr. Geist also confirmed at deposition that they had no knowledge of what occurred at this mid-year progress review and could not have assisted Ms. Coleman in drafting a response to this allegation.  *See* Exhibit 14 at 37-38; Exhibit 12 at 35-36.

30.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Brunotte did not receive a "get well plan", as required by the Manager's Guide to the Annual Performance Appraisal (a part of Defendant's performance evaluation policies).  *See* Exhibit 7 at 580; Exhibit 10 at 930.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 580; Exhibit 10 at 930.   Ms. Lane stated at deposition that she had no firsthand knowledge of whether the Manager's Guide required a "get well plan", that such matters were outside the scope of her work, and that she could not have assisted Ms. Coleman in drafting a response to this allegation.  *See* Exhibit 14 at 38-39.

31.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that her annual appraisal contained statements which were inaccurate, incomplete, and one-sided.  *See* Exhibit 7 at 580-81; Exhibit 10 at 930-31.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material

way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.
However, Ms. Lane and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7
at 580-81; Exhibit 10 at 930-31.  Ms. Lane and Mr. Geist stated they had no firsthand knowledge
of statements in Ms. Brunotte's annual appraisal she found to be inaccurate, incomplete, or one-
sided, and thus could not have assisted Ms. Coleman in preparing a response.  *See* Exhibit 14 at
39-40; Exhibit 12 at 36.

32.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by
Ms. Coleman) included Ms. Brunotte's questioning Ms. Coleman's dropping Ms. Brunotte's
performance rating from "favorable" to "partially successful" in a 16-week period during which
Ms. Coleman and herself were rarely in the office together at the same time.  *See* Exhibit 7 at
580; Exhibit 10 at 931.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO
allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the
allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See*
Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly
mentioned in this allegation.  *See* Exhibit 7 at 580; Exhibit 10 at 931.  Mr. Drugley admitted that
he had no basis to know whether Ms. Coleman's response to this allegation is complete,
incomplete, accurate, or inaccurate.  *See* Exhibit 13 at 96-98.  Ms. Lane also stated at deposition
that she had no firsthand knowledge of this questioning.  *See* Exhibit 14 at 40.  Also, Mr. Geist
stated at deposition that he could not have provided Ms. Coleman any information included in
her response to this allegation.  *See* Exhibit 12 at 36-37.

33.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by
Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman claimed at Ms. Brunotte's

mid-year evaluation that "they had been able to turn the corner"—but in fact no such 'corner turning' had occurred, leading to the next annual performance evaluation.  *See* Exhibit 7 at 580; Exhibit 10 at 931.   Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.   However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 580; Exhibit 10 at 931.   Ms. Lane stated at deposition that she had no firsthand knowledge of what occurred during this mid-year performance discussion.  *See* Exhibit 14 at 40-41.

34.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's questioning why her annual performance appraisal from Ms. Coleman was the first instance where she received negative feedback from Ms. Coleman when some of the elements evaluated dated back to her arrival at the Agency (and had been previously rated as acceptable).  *See* Exhibit 7 at 580; Exhibit 10 at 931.   Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.   Ms. Lane was not mentioned in this allegation and stated at deposition that she had no firsthand knowledge of this issue.  *See* Exhibit 14 at 41-42.

35.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman undertook no actions listed in the Manager's Guide as appropriate to take when a manager believes an employee's

performance is less than acceptable.  *See* Exhibit 7 at 580-81; Exhibit 10 at 931-32.  Ms.
Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley,
Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and
could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr.
Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7
at 580-81; Exhibit 10 at 931-32.  Ms. Lane stated at deposition that she had no firsthand
knowledge of whether Ms. Coleman undertook actions listed in the Manager's Guide.  *See*
Exhibit 14 at 42.

36.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by
Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman never read a report Ms.
Brunotte gave to Ms. Coleman which described activities of her organization.  *See* Exhibit 7 at
581; Exhibit 10 at 932.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO
allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the
allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See*
Exhibit 11 at 49-53.   However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly
mentioned in this allegation.  *See* Exhibit 7 at 581; Exhibit 10 at 932.  Ms. Lane stated at
deposition that she had no firsthand knowledge of this allegation and could not have assisted Ms.
Coleman in responding to it.  *See* Exhibit 14 at 43.

37.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by
Ms. Coleman) included Ms. Brunotte's allegation that Jim Williams, Deputy Commissioner for
FAS (and one of Ms. Coleman's then-supervisors), informed Ms. Brunotte that he was surprised
at her rating since he "always observed good things about Ms. Brunotte's performance."  *See*

Exhibit 4 at 475; Exhibit 7 at 581; Exhibit 10 at 932.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 581; Exhibit 10 at 932.  At deposition, Ms. Coleman admitted that, at the time of the disclosures, she had no expectation that Mr. Drugley, Ms. Lane, and Mr. Geist had any firsthand knowledge of Ms. Brunotte's conversation with Mr. Williams.  *See* Exhibit 11 at 86-88.  Mr. Drugley stated at deposition that he had no firsthand knowledge of this conversation and no basis to determine whether Ms. Coleman's response to this allegation is accurate, inaccurate, complete, or incomplete.  *See* Exhibit 13 at 98-99.  Ms. Lane and Mr. Geist stated at their respective depositions that they had no firsthand knowledge of this conversation and could not have assisted Ms. Coleman in drafting a response to this allegation.  *See* Exhibit 14 at 43-44; Exhibit 12 at 37-38.

38.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that during a discussion with Thomasina Williams, Ms. Williams informed her that Employee Relations was there for management and thus could not provide Ms. Brunotte with assistance except for grievance and EEO process information.  *See* Exhibit 7 at 582; Exhibit 10 at 933.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10 at 933.  Ms.

Coleman admitted that she he had no reason to believe that Mr. Drugley, Mr. Geist or Ms. Lane was present for Ms. Brunotte's conversation with Ms. Williams.  *See* Exhibit 11 at 88-89.  Mr. Drugley stated at deposition that he had no firsthand knowledge of this discussion and no basis to know whether Ms. Coleman's response to this allegation is correct, incorrect, complete, or incomplete.  *See* Exhibit 13 at 99-100.  Ms. Lane stated at deposition that she had no firsthand knowledge of this discussion.  *See* Exhibit 14 at 44-45.  Mr. Geist stated at deposition that he had no firsthand knowledge of this discussion and could not have assisted Ms. Coleman in responding to this allegation.  *See* Exhibit 12 at 39-40.

39.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that at her mid-year review on June 10, 2005, Ms. Coleman did not provide Ms. Brunotte with an "overall rating" or inform Ms. Brunotte what her element ratings were.  *See* Exhibit 7 at 582; Exhibit 10 at 933-34.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10 at 933-34.  Mr. Drugley stated at deposition that he had no firsthand knowledge of what occurred at this mid-year review and no basis to know whether Ms. Coleman's response to this allegation is correct, incorrect, complete, or incomplete.  *See* Exhibit 13 at 100-01.  Ms. Lane stated at deposition that she had no firsthand knowledge of what occurred during this mid-year review as she was not present at the meeting.  *See* Exhibit 14 at 45-46.  Mr. Geist stated at deposition that

he had no firsthand knowledge of what occurred during this mid-year review and could not have assisted Ms. Coleman in responding to this allegation.  *See* Exhibit 12 at 40-41.

40.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman's only comments were in response to Ms. Brunotte's suggestion that she focus on expanding her "sphere of influence." *See* Exhibit 7 at 582; Exhibit 10 at 934.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Ms. Lane and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10 at 934.  Ms. Lane stated at deposition that she had no firsthand knowledge of what Ms. Coleman told Ms. Brunotte with respect to this issue.  *See* Exhibit 14 at 46.  Mr. Geist stated at deposition that he had no firsthand knowledge of what Ms. Coleman told Ms. Brunotte with respect to this issue and could not have assisted Ms. Coleman in responding to this allegation.  *See* Exhibit 12 at 41.

41.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Brunotte told an Employee Relations Specialist that she was not being treated fairly by Ms. Coleman due to her sex and because Ms. Coleman viewed her as a threat.  *See* Exhibit 7 at 582; Exhibit 10 at 934.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10

at 934.  Mr. Drugley stated at deposition that he had no firsthand knowledge of the discussion in this allegation and no basis to know whether Ms. Coleman's response to this allegation is correct, incorrect, complete, or incomplete.  *See* Exhibit 13 at 103-04.  Ms. Lane and Mr. Geist both testified at deposition that they had no firsthand knowledge of the discussion with the employee relations specialist referenced in this allegation.  *See* Exhibit 14 at 47; Exhibit 12 at 42-43.

42.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman denied her request to attend a GSA network services conference.  *See* Exhibit 7 at 582; Exhibit 10 at 935.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10 at 935.  Mr. Drugley stated at deposition that he had no firsthand knowledge of what took place between Ms. Brunotte and Ms. Coleman with respect to a conversation referenced in Ms. Coleman's response to this allegation and no basis for knowing whether Ms. Coleman's response is correct, incorrect, complete, or incomplete.  *See* Exhibit 13 at 104-05.

43.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that, on the morning of her initial EEO interview, Kerry Mannion informed her that a criminal investigation was being initiated relating to documents she submitted relating to her travel.  *See* Exhibit 7 at 582; Exhibit 10 at 935.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley,

Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 582; Exhibit 10 at 935.   Ms. Lane stated at deposition that she had no firsthand knowledge of a conversation between Mr. Mannion and Ms. Brunotte.  *See* Exhibit 14 at 47-48.  Mr. Geist stated at deposition that he had no firsthand knowledge of a conversation between Mr. Mannion and Ms. Brunotte and could not have assisted Ms. Coleman in responding to this allegation.  *See* Exhibit 12 at 43-44.

44.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that she attempted to resolve the situation regarding the criminal investigation within Employee Relations.  *See* Exhibit 7 at 583; Exhibit 10 at 936.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53. However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 583; Exhibit 10 at 936.  Ms. Lane stated at deposition that she had no firsthand knowledge of what took place between Ms. Brunotte and the individuals she contacted to resolve this situation.  *See* Exhibit 14 at 48-49.

45.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman significantly reduced the requested award amounts for Ms. Brunotte's team without discussing the reductions with her beforehand.  *See* Exhibit 7 at 584; Exhibit 10 at 939.  Ms. Coleman generally claimed to have

disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 584; Exhibit 10 at 939.  Ms. Lane and Mr. Geist stated at their respective depositions that they had no firsthand knowledge of this issue and could not have assisted Ms. Coleman in responding to this allegation.  *See* Exhibit 14 at 49; Exhibit 12 at 46-47.

46.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that she met with Jim Williams on August 19 to discuss tension between herself and Ms. Coleman and to request his assistance in being reassigned.  *See* Exhibit 7 at 584-85; Exhibit 10 at 939.  Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them.  *See* Exhibit 11 at 49-53.  However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation.  *See* Exhibit 7 at 584-85; Exhibit 10 at 939.  Mr. Drugley and Ms. Lane stated at their respective depositions that they had no firsthand knowledge of this meeting and no basis to know whether Ms. Coleman's response to this allegation is accurate, inaccurate, complete, or incomplete.  *See* Exhibit 13 at 105-07; Exhibit 14 at 49-50. Mr. Geist stated at deposition that he was not present at this meeting.  *See* Exhibit 13 at 47.

47.     The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman had "gotten rid" of Darlene Fuller for Ms. Brunotte.   *See* Exhibit 7 at 585; Exhibit 10 at 940.  Ms. Coleman generally

claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them. *See* Exhibit 11 at 49-53. However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 585; Exhibit 10 at 940. Mr. Drugley stated at deposition that he had no knowledge of what took place during this conversation and no basis to know whether Ms. Coleman's response to this allegation is accurate, inaccurate, complete, or incomplete. *See* Exhibit 13 at 108. Ms. Lane stated at deposition that she had no firsthand knowledge of what took place during this conversation. *See* Exhibit 14 at 50-51.

48.       The EEO Counselor's notes from the interview of Ms. Brunotte (which were disclosed by Ms. Coleman) included Ms. Brunotte's allegation that Ms. Coleman told her that employees were jealous that Ms. Brunotte was GS-15, step 10. *See* Exhibit 7 at 585; Exhibit 10 at 940. Ms. Coleman generally claimed to have disclosed Ms. Brunotte's EEO allegations to Mr. Drugley, Ms. Lane, and Mr. Geist because they were mentioned in the allegations in a material way and could have assisted Ms. Coleman in responding to them. *See* Exhibit 11 at 49-53. However, Mr. Drugley, Ms. Lane, and Mr. Geist were not expressly mentioned in this allegation. *See* Exhibit 7 at 585; Exhibit 10 at 940. Ms. Lane and Mr. Geist stated at deposition that they had no firsthand knowledge of what was said during this discussion and could not have assisted Ms. Coleman in responding to this allegation. *See* Exhibit 14 at 51; Exhibit 12 at 48.

49.       Ms. Coleman further claimed that part of the reason for disclosing the EEO Counselor's summary of her interview with Ms. Brunotte to Ms. Lane and Mr. Drugley was that they would have had access to Ms. Coleman's e-mail account (and other documents) and would have

received the summary anyway.  *See* Exhibit 11 at 51-52, 75. However, Ms. Coleman also admitted that she did not know for a fact that Ms. Lane or Mr. Drugley had actually read any of the e-mails.  *See* Exhibit 11 at 76.  Ms. Coleman admitted that Mr. Geist did not have any similar access to Ms. Coleman's e-mails.  *See* Exhibit 11 at 75.

50.    EEOC regulatory authorities only speak of three categories of persons whom should be provided with information in connection with the informal phase:  complainants, responding agency officials and witnesses with direct knowledge of the situation so identified by the EEO Counselor.  *See* MD-110, Appendix A, §§ B.1, D.2.A.  In connection with her then-pending informal EEO complaint against Defendant General Services Administration (later identified by Defendant as Agency Complaint No. 06COFTARB-1), Ms. Brunotte was the complainant.  Ms. Coleman and Mr. Williams were the only identified Responding Management Officials (RMOs) for Ms. Brunotte's EEO complaint; Mr. Drugley, Ms. Lane, Mr. Geist and Mr. Bolster were not RMOs.  *See* Exhibit 1 at 3-4; Exhibit 2 at 26-35.

51.    As recorded by Ms. Brunotte in affidavits from August 2006 in connection with her EEO complaint, Ms. Brunotte learned of Ms. Coleman disclosure of copy of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte to Mr. Geist and Mr. Drugley on or about March 10, 2006.  *See* Exhibit 3 at 100, 103.  As recorded by Ms. Brunotte in affidavits from August-September 2006 in connection with her EEO complaint, Ms. Brunotte later separately learned of Ms. Coleman disclosure of copy of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte to Ms. Lane and Mr. Bolster sometime between August 7, 2006, and August 22, 2006, when shown a copy of the actual e-mail transmittal by Mr. Geist.  *Compare id.* at 100, 103 *to* Exhibit 15 at 58-61; Exhibit 38 (EEO ROI Vol. 2, Ex. 13) at 594, 630.

27

52.     After learning of Ms. Coleman disclosure of copy of EEO counselor Joy Savage's notes of her interview with Ms. Brunotte, Ms. Brunotte suffered severe emotional distress.  *See* Exhibit 37 (EEO ROI, Vol. 3, Ex. 30) at 948-51, 956-57.  Ms. Coleman's disclosure caused Ms. Brunotte a number of personal and professional harms, including causing Ms. Brunotte to become alienated from her coworkers, damaged Ms. Brunotte's professional reputation and left Ms. Brunotte anxious.  *See id.*  These disclosures, in conjunction with other harms suffered by Ms. Brunotte from Ms. Coleman's ongoing discrimination, exacerbated Ms. Brunotte's medical condition, as corroborated by Ms. Brunotte's treating psychiatrists.  *See id.* at 958-60.  Ms. Brunotte incurred pecuniary expenses in the treatment of these conditions, including out-of-pocket expenses for payments for treatments by Jane Anthony Buckman and for mileage traveling to and from treatment at Tricare and with Ms. Buckman (travel to the Tricare facility from Ms. Brunotte's then-residence in Arlington, VA was roughly 8 miles round-trip, and travel to Ms. Buckman's office was roughly 7 miles roundtrip). *See* Exhibit 16 at 20; Exhibit 37 at 959-60; Exhibit 60 (affidavit of Rebecca Brunotte).

53.     Ms. Coleman made allegations against Ms. Brunotte to Defendant's Office of Inspector General, through its 'Fraudnet Hotline.'   *See* Exhibit 11 at 17; Exhibit 27; Exhibit 29 at 2; Exhibit 47 (documents showing Coleman Fraudnet complaint).

54.     At the time of the IG investigation of Ms. Brunotte and of Ms. Brunotte's application to work for GPO (discussed in greater detail *infra*), Kerry Mannion was an employee of Defendant, a special agent working in Defendant's Office of the Inspector General.   Exhibit 27 (GSA OIG investigative statement from Kerry Mannion) at 1; Exhibit 31 (excerpts from deposition of Kerry Mannion) at 18-19.   At that time, Mr. Mannion was supervised by Randal Stewart, an employee

of Defendant working in Defendant's Office of the Inspector General.  Exhibit 26 (GSA OIG

investigative statement from Randal Stewart) at 1; Exhibit 27 at 2; Exhibit 31 at 38-39; Exhibit

33 (excerpts from deposition of Randal Stewart) at 12, 16-17.  Mr. Mannion was further also

supervised by Floyd Martinez, an employee of Defendant working in Defendant's Office of the

Inspector General.[6]  *See* Exhibit 31 at 38-39; Exhibit 34 at 13-14.

55.    Ms. Coleman's complaint against Ms. Brunotte was assigned by Mr. Stewart to Mr.

Mannion for investigation. *See* Exhibit 48 (documents showing investigation assignment to

Mannion).

56.    Mr. Mannion was a rookie special agent at the time of his investigation of Ms. Brunotte.

*See* Exhibit 33 at 56.  Prior to becoming a special agent at GSA's Office of Inspector General in

2005, Mr. Mannion's prior law enforcement experience—all non-federal law enforcement--all

involved little investigative work.  *See id.* at 20, 22, 56-57.  Mr. Mannion's investigation into

Ms. Brunotte was one of the first cases he was assigned as a special agent at GSA, if not the very

first.  *See* Exhibit 31 at 45, 98.

---

[6]    At deposition, Mr. Martinez admitted having talked to Mr. Mannion the night before
being deposed in the instant matter about his upcoming deposition, after having separately
denied that he spoke to anyone other than counsel about the deposition and after having denied
that he spoke to Mr. Mannion about any matters pertaining to the instant lawsuit. *See* Exhibit 34
at 9-10, 64-66.  After denying that he spoke with anyone else regarding his deposition, Mr.
Mannion admitted that he and Mr. Martinez had spoken the night before Mr. Mannion's
depositions, and noted that he and Mr. Martinez had at some point notified each other that they
were going to be deposed in the instant case.  *See* Exhibit 31 at 11-13.  Based on these facts,
Plaintiff reasonably infers that genuine issues of material fact exist concerning Mr. Martinez'
credibility, in particular as to whether he coordinated his testimony at deposition with Mr.
Mannion, raising a credibility issue requiring a trial to resolve.

57.     Mr. Mannion completed his investigation in December 2005, and forwarded information he collected to the U.S. Attorney's Office.  *See* Exhibit 29 (Mannion Fax to GPO) at 5, 10-19; Exhibit 49 (prosecutorial package).

58.     Although Ms. Brunotte was charged, she was never convicted of any criminal offense. *See* Exhibit 29 (Mannion Fax to GPO) at 5, 10-19.  Instead, the prosecution was dismissed on February 2, 2006 and case was moved into pretrial diversion pursuant to an agreement with Ms. Brunotte, due to the prosecutor's concession that any inaccuracies in the submissions by Ms. Brunotte were not based on her intent to commit fraud or theft.  *See id.* at 5, 9; Exhibit 37 at 950; Exhibit 51 (dismissal order).  Pretrial diversion is not the same thing as criminal probation.  *See* Exhibit 44 (GSA OIG ROI Ex. 24); Exhibit 58 (GPO close-out letter).  Under the terms of Ms. Brunotte's pretrial diversion agreement (which Mr. Mannion had in his possession as of June 2006). Ms. Brunotte's successful completion of the terms of the pretrial diversion would result in Ms. Brunotte never being prosecuted for the offenses she was charged with.  *See* Exhibit 13 (Pretrial diversion agreement) at 3.  Under the terms of the same pretrial diversion agreement, all of Ms. Brunotte's obligations under the agreement were to be completed on or before November 12, 2006.  *See id.* at 4.  Mr. Mannion admitted that Ms. Brunotte's pretrial diversion agreement did not contain the word "probation".  *See* Exhibit 31 at 119.

59.     Mr. Mannion was notified that the charges against Ms. Brunotte had been dismissed and that a pretrial diversion agreement was pending completion no later than February 13, 2006.  *See* Exhibit 52 (Mannion e-mails to and from Wheatley); *see also* Exhibit 43 (index record showing Mannion receiving fax notice of charge dismissal on February 13, 2006).  Despite knowing that the charges against Ms. Brunotte had been dismissed and that the case was pending pretrial

diversion, Mr. Mannion nonetheless requested permission from Assistant US Attorney Joseph Wheatley to have a hidden recording device placed on Ms. Brunotte's coworker John Prahm in hopes of finding further evidence against Ms. Brunotte.  *See* Exhibit 52 ("Following the interview, Prahm contacted me again and informed me had an appointment scheduled later that evening with Brunotte. […] While recognizing the charges were dismissed and the Pretrial Diversion agreement is pending, there might be some value gained by seeing if Prahm would agree to wear a wire during the meeting.").  In response, AUSA Wheatley rejected the request, citing the use of a wire as "too disproportional to the offenses".[7] *See id.*  Notably, Mr. Mannion did not record these February 16-17, 2006, discussions with Mr. Wheatley in his Investigative Case File Index.  *Compare id. to* Exhibit 43.

60.     Mr. Mannion received a full copy of Ms. Brunotte's pretrial diversion agreement on June 27, 2006, and notified Mr. Martinez of this pretrial diversion agreement on or around June 30, 2006.  *See* Exhibit 29 at 10; Exhibit 31 at 57-58; Exhibit 33 at 77-79; Exhibit 53 (Pretrial diversion agreement).  Mr. Mannion was further notified on October 20, 2006, that Ms. Brunotte was taking actions to comply with her obligations under the pretrial diversion agreement.  *See* Exhibit 29 at 7-8. Mr. Mannion notified Mr. Martinez of Ms. Brunotte's compliance actions. *See id.*  Ms. Brunotte completed the terms of the pretrial diversion agreement and was discharged from pretrial diversion on October 27, 2006.  *See* Exhibit 54 (pretrial diversion discharge notice). Mr. Martinez testified that a person reading the pretrial diversion agreement would have seen the absence of the term "probation", differentiating Ms. Brunotte's pretrial diversion agreement from the pretrial diversion agreements Mr. Martinez had seen involving probation as a term of the

---

[7]     The total amount of losses which Ms. Brunotte was charged with was only $1,469.50. *See* Exhibit 49 (prosecutorial package).

agreement, in that the pretrial diversion agreements Mr. Martinez had seen involving probation as a term of the agreement all expressly listed probation as a term of the agreement.  *See* Exhibit 34 at 88-91.  Mr. Brown, in his statement in a later investigation and at deposition, testified that Mr. Mannion had told him on November 20, 2006, that Ms. Brunotte was on probation.  *See* Exhibit 28 at 1; Exhibit 32 at 38-39.

61.     Mr. Mannion knew at the time of his call to Mr. Brown that the mere fact that documentation in the investigative file referenced the probation office was not dispositive of whether or not the individual in question was under probation, and admitted that he knew that pretrial diversions were often also supervised by probation offices.  *See* Exhibit 31 at 94-95.

62.     Mr. Drugley served as the point of contact from Ms. Coleman to Mr. Mannion during Mr. Mannion's investigation     *See* Exhibit 11 at 20-21; Exhibit 13 at 26-34; Exhibit 27 at 1-2.  Mr. Drugley testified that his role in Mr. Mannion's investigation was solely limited to relaying information from Ms. Coleman to Mr. Mannion, providing substantive answers to Mr. Mannion's questions at the direction of Ms. Coleman or requesting that Mr. Mannion clarify one of his requests for information.  *See* Exhibit 13 at 31-34.  Mr. Drugley admitted that any contacts other than those would have been outside of his role as Ms. Coleman's point of contact—Mr. Drugley's sole role in Mr. Mannion's investigation.  *See id.* at 26, 34-35.  Based on these facts, Plaintiff reasonably infers that any contacts by Mr. Drugley with Mr. Mannion that were not either at the direction of Ms. Coleman, responding to an information request from Mr. Mannion or to clarify a question from Mr. Mannion could not be a communication made by Mr .Drugley in connection with Mr. Mannion's investigation.  Mr. Drugley accused Mr. Mannion of dragging his feet in his investigations concerning Ms. Brunotte without having been instructed to do so by

Ms. Coleman.  *See* Exhibit 11 at 21-22, Exhibit 13 at 38.  Mr. Drugley admitted that he made this accusation outside of his role as Ms. Coleman's point of contact.  *See* Exhibit 13 at 38.

63.     In March 2006, Defendant's Office of Inspector General notified Ms. Coleman of the results of Ms. Coleman's IG complaint against Ms. Brunotte, in the form of an Interim Letter Report of Investigation.  *See* Exhibit 26 at 1; Exhibit 50 (interim letter report of investigation). The Interim Letter Report of Investigation notified Ms. Coleman that the charges against Ms. Brunotte had been dismissed, and that Ms. Brunotte had entered a pretrial diversion agreement. *See* Exhibit 50 at 3, 5.  The text of the Interim Letter Report of Investigation indicated that a copy of Ms. Brunotte's pretrial diversion agreement was appended to it as 'attachment 5.'  *See id.*  According to the express test of the report, the investigation was complete, in that the contents of the final report of investigation were merely the interim letter report of investigation and any documents of resultant court actions.  *See id.* at 5*;* Exhibit 33 at 72-73.  Mr. Mannion admitted that he prepared a draft of the Interim Letter Report of Investigation.  *See* Exhibit 31 at 67.  Ms. Coleman admitted having been notified that Ms. Brunotte's case was diverted into pretrial diversion, with the charges against Ms. Brunotte dismissed.  *See* Exhibit 11 at 22-24. Ms. Coleman testified that Mr. Drugley was notified of Ms. Brunotte's pretrial diversion at the same time she was.  *See id.*  Mr. Drugley testified that Mr. Mannion notified him that the criminal charges against Ms. Brunotte were not going to trial.  *See* Exhibit 13 at 44-45.  Mr. Drugley further testified that Ms. Coleman generally kept him informed of important events in Mr. Mannion's investigation, and that Ms. Coleman likely timely informed him if she learned that the criminal charges were dropped.  *See* Exhibit 13 at 50-51, 60-61. Ms. Coleman admitted having made a targeted disclosure of the pendency of an OIG investigation against Ms. Brunotte

in at least one instance.  *See* Exhibit 7 at 508; Exhibit 27 at 951-52, 956; Exhibit 38 at 627-28.

Specifically, Ms. Coleman made the disclosure to another manager at GSA who was considering

taking Ms. Brunotte on a temporary reassignment (a "detail").  *See id.*  Plaintiff reasonably

infers that the purpose of Ms. Coleman's disclosure was to inhibit Ms. Brunotte's ability to seek

new positions.  After Ms. Coleman made her disclosure, Ms. Brunotte did not receive the detail.

*See id.*

64.     Dawn Lloyd, a timekeeper within CIO during relevant parts of the 2005-2006 timeframe,

reported overhearing Ms. Coleman and Ms. Drugley gleefully discussing 'having something on

Ms. Brunotte' in reference to the IG investigation.  *See* Exhibit 37 at 950-51; Exhibit 38 at 602,

613.

65.     Mr. Mannion admitted that, after the pretrial diversion agreement had been entered, his

active investigation into Ms. Brunotte had been completed.  *See* Exhibit 31 at 63-64.  During the

time period between the pretrial diversion agreement and his call to Mr. Brown on November 20,

2006, Mr. Mannion was not investigating any other allegations of misconduct regarding Ms.

Brunotte.  *See* Exhibit 31 at 66, 72. After having been notified of Ms. Brunotte's pretrial

diversion, Ms. Coleman came to the conclusion that Mr. Mannion's investigation into Ms.

Brunotte had concluded by that point.  *See* Exhibit 11 at 28-29, 38-39.

66.     Mr. Drugley had claimed that he was in frequent contact with Mr. Mannion.  *See* Exhibit

30.  However, Mr. Drugley testified that, after the conclusion of Mr. Mannion's investigation

into Ms. Brunotte, Mr. Drugley did not have any further contact with Mr. Mannion, and that by

the time of his deposition he had not spoken with Mr. Mannion in years.  *See* Exhibit 13 at 65.

Mr. Mannion testified that he could not recall having any contact with Mr. Drugley between the

March 2006 issuance of the interim report of investigation and Mr. Drugley's November 20, 2006 call which preceded Mr. Mannion's call to Mr. Brown.  *See* Exhibit 31 at 47-48, 102-03; *see also* Exhibit 50.  However, Mr. Mannion had previously testified that he regularly spoke with Mr. Drugley about Ms. Brunotte, testimony which he called into question later at deposition.  *See* Exhibit 27; Exhibit 31 at 103-03.  Mr. Drugley had testified that he and Mr. Mannion talked about Mr Mannion's father, because Mr. Drugley knew Mr. Mannion's father from the military.  *See* Exhibit 13 at 36-37.  Mr. Mannion denied this, saying that his father did not directly know Mr. Drugley, even though they were in the Army Transportation Corps in Europe.  *See* Exhibit 31 at 51-53.  Based on these facts, Plaintiff reasonably infers that a genuine issue of material fact exists as to the frequency and substance of Mr. Drugley's contacts with Mr. Mannion prior to Mr. Mannion's call to Mr. Brown at GPO in November 2006, raising an issue of credibility requiring a trial to resolve.

67.     On June 20, 2006, Ms. Brunotte applied for the position of IT Specialist (Customer Support/Policy and Planning), PG-2210-15, with the U.S. Government Printing Office (GPO).  *See* Exhibit 19 (Copy of Ms. Brunotte's application with e-mail transmittal); Exhibit 20 (Excerpts from Ms. Brunotte's affidavit in support of her adverse action appeal in *Brunotte v. Government Printing Office,* MSPB Docket No. DC-3443-07-0238-I-1) at 2.  GPO advertised the position under Job Announcement No. 06-436.  *See id.;* Exhibit 25 (copy of vacancy announcement).  Ms. Brunotte resubmitted this application to GPO human resources staff, per their request, on August 23, 2006.  *See* Exhibit 20 at 2.

68.     GPO tentatively selected Ms. Brunotte for the IT Specialist (Customer Support/Policy and Planning) position, and notified her of her selection on October 5, 2006.  *See* Exhibit 20 at 3-

35

4, Exhibit 21 (notice of GPO tentative selection of Ms. Brunotte); Exhibit 22 (correspondence between GPO human resources and Ms. Brunotte regarding OF-306, SF-85 and other documents); Exhibit 40 (deposition of Schweickhardt) at 28.   Ms. Brunotte was selected by Reynold Schweickhardt, GPO's Chief Information Officer and the selecting official for the vacancy Ms. Brunotte applied to.  *See id.* at 16, 19-20.  That same day, GPO requested that Ms. Brunotte file several pieces of routine paperwork for processing of her selection, including a copy of the U.S. Office of Personnel Management's Optional Form 306 (OF-306).  *See* Exhibit 20 at 3-4; Exhibit 22.   Ms. Brunotte was not required to file a copy of OF-306 with her application packet for the position at GPO, as an OF-306 was not expressly required under the terms of the vacancy announcement.  *See* Exhibit 25.   According to the terms of the vacancy announcement, the OF-306 was not part of the "compete application package" for the position. *See id.*  Ms. Brunotte signed the OF-306 on October 5, 2006, and filed the requested documents with GPO on October 11, 2006.[8]  *See* Exhibit 20 at 4; Exhibit 22; Exhibit 23 (Brunotte OF-306 form).

69.    Ms. Brunotte retained a copy of her application for the position of IT Specialist (Customer Support/Policy and Planning), PG-2210-15 with the Government Printing Office for the initial period after she submitted the application, and would have been readily able to produce a copy of  those application materials in November 2006, had she been asked at the time.  *See* Exhibit 35 (affidavit of Ms. Brunotte).

---

[8]    Mr. Brown testified that, when examining a document such as an OF-306 for possible falsification about events occurring in the 'last five years', the specific date of signature is important to know in terms of whether the document was falsified in that specific timeframe. *See* Exhibit 32 at 52-54.  For Ms. Brunotte's OF-306, that five year period would be October 5, 2001, through October 5, 2006.  *See id.* at 83-84.

70.     On October 12, 2006, Ms. Coleman issued a notice of proposed removal to Ms. Brunotte, citing Mr. Mannion's interim investigative report as its factual basis.  *See* Exhibit 55 (notice of proposed removal).  Notably, this notice of proposed removal was issued after Ms. Brunotte had filed her job application with GPO, after GPO had selected Ms. Brunotte for the position and extended a job offer to her, more specifically, one week after Ms. Brunotte had signed the OF-306 form and one day after Ms. Brunotte had submitted her OF-306 and other requested routine pre-employment paperwork to GPO.  *Compare id. to* Exhibit 19, Exhibit 20 at 2-4, Exhibit 21, Exhibit 22, Exhibit 23.   Ms. Coleman notified Mr. Drugley of the proposed removal of Ms. Brunotte.  *See* Exhibit 30 at 1.  Ms. Sesker further testified that Mr. Drugley would likely have been involved with implementing Ms. Brunotte's settlement agreement as he would have processed Ms. Brunotte's resignation and the related personnel paperwork (in particular, SF-50 and SF-52 forms).  *See* Exhibit 41 (Deposition of Sesker) at 82-83.

71.     Ms. Brunotte settled both the proposed removal and her outstanding EEO case against GSA through a settlement agreement, which was signed by the various signatories between November 15 and 20, 2006.  *See* Exhibit 56 (GSA settlement agreement).  This settlement agreement contemplated Ms. Brunotte resigning from GSA and/or transferring to another federal agency, with GSA agreeing to prove Ms. Brunotte with a clean record and a neutral reference. *See id.* at 2-3.  Ms. Brunotte's plan was to transfer to GPO without a break in service, into the IT Specialist (Customer Support/Policy and Planning), PG-2210-15, position for which she had been tentatively selected in October 2006. *See, e.g.,* Exhibit 20 at 6-7.    This settlement agreement contained neutral reference provisions concerning disclosure of information regarding Ms. Brunotte to her potential future employers.  *See* Exhibit 56.  The neutral reference provision

specified exactly what information could be produced to prospective employers and by whom. *See id.* Ms. Brunotte's designated GSA neutral reference provider under the settlement agreement was not Mr. Mannion. *See id.* The neutral reference information specified in the settlement agreement did not include the fact that criminal charges had been filed against Ms. Brunotte, the fact that GSA had proposed Ms. Brunotte's removal, the substance of the allegations against Ms. Brunotte which underlay those criminal charges or that proposed removal, the fact that the proposed removal had been settled, the existence of a settlement agreement or the terms thereof. *See id.* The settlement agreement further contained no express clause excluding GSA's Office of Inspector General from its ambit. *See id.* Ms. Coleman was notified of the settlement agreement shortly after the settlement was agreed to. *See* Exhibit 11 at 34-35. Ms. Sesker confirmed discussing the settlement with Ms. Coleman right around the time the settlement was signed; Ms. Coleman asked Ms. Sesker at the time why the Agency entered into a settlement agreement with Ms. Brunotte. *See* Exhibit 41 at 58-59. Ms. Coleman heard that Ms. Brunotte had an offer from another agency, and indicated that she may have discussed that information with Mr. Drugley. *See* Exhibit 11 at 37.

72.    Mr. Mannion was notified by Mr. Drugley that Ms. Brunotte was applying for a position with GPO on or about November 20, 2006. *See* Exhibit 26 at 1; Exhibit 27 at 2; Exhibit 31 at 76-77; *see also* Exhibit 13 at 56, 58, 60. Mr. Drugley also told Mr. Mannion at the time that he (Drugley) was upset that Ms. Brunotte had not been sent to jail, fired or otherwise barred from the civil service because of an allegedly falsified travel voucher. *See* Exhibit 13 at 54; Exhibit 30 (GSA OIG investigative statement from Gary Drugley) at 2. Mr. Drugley further stated in a later investigation , "[w]hen asked why he called SA MANNION, Drugley stated, 'to rag HIS ass for not

38

getting her fired.'"  *See* Exhibit 30 at 2.  Mr. Drugley admitted having opined that he believed that Ms. Brunotte ought to be fired or imprisoned for the travel issues investigated by Mr. Mannion, and admitted being upset that Ms. Brunotte had settled  with GSA in that Ms. Brunotte had not too light a penalty.  *See* Exhibit 13 at 40-42.  Mr. Drugley also testified that he saw Ms. Brunotte as "a taint on the class of employees […] retired military who were now in the civil service." *See* Exhibit 13 at 54-55. Ms. Coleman testified that both she was upset that the charges against Ms. Brunotte were dropped; Ms. Coleman also testified that Mr. Drugley was upset that the charges against Ms. Brunotte were dropped, and that Mr. Drugley was later upset that Ms. Brunotte was permitted to resign, due to his belief that Ms. Brunotte had not suffered enough negative consequences for her alleged conduct.  *See* Exhibit 11 at 24-25, 36.  Based on these facts, the fact that Ms. Coleman was aware of Ms. Brunotte's settlement agreement, and the fact that Ms. Coleman and Mr. Drugley had received information that Ms. Brunotte had an offer of a position with another federal agency, Plaintiff reasonably infers that Mr. Drugley and Ms. Coleman had motive to take steps to seek additional negative consequences for Ms. Brunotte through trying to prevent Ms. Brunotte from moving into a position with another federal agency, creating a genuine issue of material fact as to whether Ms. Coleman and Mr. Drugley conspired to prevent Ms. Brunotte from moving into a position with another federal agency, an issue of credibility best resolved at trial.

73.     Mr. Drugley testified that Ms. Coleman generally kept him informed of the events in the IG investigation, and she would have timely notified him if she had learned that the charged against Ms. Brunotte had been dropped.  *See* Exhibit 13 at 50-51.  Ms. Coleman testified that Mr. Drugley was notified of Ms. Brunotte's pretrial diversion at the same time she was.  *See* Exhibit

11 at 22-24.  Mr. Drugley testified that, upon being informed that the criminal charges against Ms. Brunotte were dropped, he then assumed that the investigation into Ms. Brunotte was concluded.  *See* Exhibit 13 at 51-53.  Mr. Drugley further admitted that he was likely aware that the criminal charges against Ms. Brunotte had been dropped prior to his call to Mr. Mannion on November 20, 2006.  *See id.* at 51, 62-63.  Based on these facts, and the fact that Ms. Coleman was notified of the dismissal of charges against Ms. Brunotte through the March 2006 Interim Letter Report of Investigation, Plaintiff reasonably infers that Ms. Coleman notified Mr. Drugley in or around March 2006 that the criminal charges against Ms. Brunotte had been dismissed, and further reasonably infers that Mr. Drugley was aware that the criminal charges against Ms. Brunotte were dismissed at the time of Mr. Drugley's November 20, 2006, conversation with Mr. Mannion.  Mr. Drugley testified that his only reason for disclosing having Ms. Brunotte's plans to work for GPO to Mr. Mannion was "information sharing", as part of the "information sharing" process connected with Mr. Mannion's investigation of Ms. Brunotte.  *See* Exhibit 13 at 46-46, 53-54.  However, Mr. Drugley admitted that he had no definite information that Ms. Brunotte was leaving GSA, and that he was merely relaying rumors to Mr. Mannion.[9]  *See id.* at 69-71.

---

[9]    Mr. Drugley testified that his role in Mr. Mannion's investigation was solely limited to relaying information from Ms. Coleman to Mr. Mannion, providing substantive answers to Mr. Mannion's questions at the direction of Ms. Coleman or requesting that Mr. Mannion clarify one of his requests for information.  *See* Exhibit 13 at 31-34.  Mr. Drugley admitted that any contacts other than those would have been outside of his role as Ms. Coleman's point of contact—Mr. Drugley's sole role in Mr. Mannion's investigation.  *See id.* at 26, 34-35.  Mr. Mannion's investigate file at the time did not indicate any active investigative steps taken to investigate Ms. Brunotte between the time the criminal charges were dropped in February 2006 and when he called Mr. Brown in November 2006, after Mr. Drugley contacted Mr. Mannion.  *See* Exhibit 27 at 2; Exhibit 31 at 72-73, 76-77; Exhibit 43.  Mr. Drugley further testified that, upon being notified that the dropping of the criminal charges against Ms. Brunotte, he would have assumed that the investigation into Ms. Brunotte's past conduct was concluded.  *See* Exhibit 13 at 52.  Ms. Coleman denied being aware that Mr. Drugley had made contact with Mr. Mannion, and testified that Mr. Drugley had not sought her consent prior to releasing information to Mr. Mannion in

Mr. Drugley admitted that, "[w]hen asked why he called SA MANNION, Drugley stated, 'to rag HIS ass for not getting her fired.'", a statement which Mr. Drugley later verified as accurate at deposition. *See* Exhibit 13 at 58; Exhibit 30 at 2.   Based on these facts, the fact that Mr. Drugley had no 'information' to share with Mr. Mannion in that all he knew of Ms. Brunotte's plans to leave GSA was rumor, the fact that Mr. Drugley testified that was upset that Ms. Brunotte had not been jailed/fined/ debarred from civil service, and the fact that Mr. Drugley testified that he wanted to was "to rag HIS ass for not getting her fired.", Plaintiff reasonably infers that an inconsistency exists between Mr. Drugley's testimony that he was engaging in "information sharing" in November 20, 2006, in that the investigation into Ms. Brunotte and Mr. Drugley's testimony that he would have presumed that the very same investigation was concluded by dint of the dismissal of charges against Ms. Brunotte,, creating a genuine issue of material fact as to what Mr. Drugley's actual reason was for disclosing Ms. Brunotte's plans to go to GPO to Mr. Manley, an issue of credibility best resolved at trial.

74.     Mr. Drugley and Mr. Mannion claimed that they regularly spoke concerning Ms. Brunotte's between May 2006 and November 2006.  *See* Exhibit 27 at 2; Exhibit 30 at 1. However, Mr. Drugley testified at deposition that he only contacted Mr. Mannion to disclose

_____

November 2006.  *See* Exhibit 11 at 68.  Based on these facts, Plaintiff reasonably infers that Mr. Drugley's contact to Mr. Mannion was not relaying investigation-related information from Ms. Coleman to Mr. Mannion, providing substantive answers to Mr. Mannion's questions at the direction of Ms. Coleman or requesting that Mr. Mannion clarify one of his requests for information.  Mr. Drugley admitted that he did not know why he would have continued having contact with Mr. Mannion regarding Ms. Brunotte after the investigation into Ms. Brunotte was presumably concluded.  *See* Exhibit 13 at 115-16.  Based on these facts and reasonable inferences, Plaintiff reasonably infers that a genuine issue of material fact exists as to Mr. Drugley's credibility in his assertion that the disclosure was part the "information sharing" process in Mr. Mannion's investigation of Ms. Brunotte, an issue of credibility best resolved at trial. Plaintiff further reasonably infers that a genuine issue of material fact exists as to the extent of Ms. Coleman's involvement in instigating Mr. Drugley's call to Mr. Mannion in November 2006, an issue of credibility best resolved at trial.

information at the direction of Ms. Coleman.  *See* Exhibit 31 at 31-32.   Ms. Coleman testified

that there was no business reason for Mr. Drugley and Mr. Mannion to be in contact during the

March 2006-November 2006 timeframe other than hypothetical issues with implementation of

Ms. Brunotte's pretrial diversion agreement.  *See* Exhibit 11 at 30-31.

75.     Mr. Mannion telephoned Nathaniel Brown to discuss Ms. Brunotte's application to work

for GPO on or about November 20, 2006.   *See* Exhibit 27 at 2; Exhibit 28 (GSA OIG

investigative statement from Nathaniel Brown) at 1; Exhibit 31 at 48; Exhibit 32 (excerpts of

deposition of Nathaniel Brown) at 26-27.  Although Mr. Mannion and Mr. Brown had allegedly

met previously at a training conference, this was the first case-related contact between them; Mr.

Brown did not recall having otherwise spoken to Mr. Mannion in the interim.  *Cf.* Exhibit 31 at

83; Exhibit 32 at 22-24.  Mr. Brown and GPO had not provided information to Mr. Mannion

during Mr. Mannion's original investigation of Ms. Brunotte.  *See* Exhibit 43; *see also* Exhibit

28 at 1; Exhibit 32 at 70-72.

76.     At the time of Mr. Mannion's call, Mr. Brown was an employee of GPO's Office of

Inspector General (specifically, an ordinary special agent), and did not work for GPO's human

resources office.  *See* Exhibit 27 at 2; Exhibit 28 at 1; Exhibit 32 at 18-19.  Ms. Brunotte's job

application was not in Mr. Brown's possession, custody or control, as demonstrated by the fact

that Mr. Brown did not know if Ms. Brunotte had applied to work at GPO, and had to check with

others to determine if she had applied and to procure a copy of her application.  *See* Exhibit 27 at

2; Exhibit 31 at 94, 108; Exhibit 32 at 42-43.

77.     At the time of Mr. Mannion's call, Mr. Brown was a special agent in GPO's Office of

Inspector General.   *See* Exhibit 28 at 1; Exhibit 32 at 18-19.  Based on these facts, Plaintiff

reasonably infers that Mr. Brown was not any agency or instrumentality at the time or Mr. Mannion's call.  Examination of issues involving applicants to work for GPO was not a conventional part of Mr. Brown's duties; Ms. Brunotte's application was the first instance where he had investigated alleged false statements in an application despite having been a full special agent at GPO for over 1 ½ years.  *See* Exhibit 32 at 18-19, 26.

78.    Mr. Mannion's alleged purpose for contacting Mr. Brown at GPO was to collect information regarding the information Ms. Brunotte provided in her application, on the grounds that he (Mannion) allegedly believed that Ms. Brunotte might have submitted false information to GPO in her job application.  *See* Exhibit 26 at 1-2; Exhibit 32 at 30-33, 72.  Mr. Mannion made the request for Ms. Brunotte's job application to Mr. Brown verbally, and then the next day (November 21, 2006) in writing on a fax cover sheet.  *See* Exhibit 27 at 2; Exhibit 28 at 1; Exhibit 29 at 1.

79.    In asking Mr. Brown for Ms. Brunotte's application, Mr. Mannion alleged to Mr. Brown that Ms. Brunotte might have made a false statement in her application.  *See* Exhibit 28 at 1; Exhibit 31 at 116; Exhibit 32 at 30-33, 38.  Mr. Brown later provided Mr. Mannion with a copy of Ms. Brunotte's application; Mr. Mannion reviewed the application but did not keep a copy. *See* Exhibit 27 at 3; Exhibit 28 at 2; Exhibit 32 at 42.

80.    During this November 20, 2006, call, Mr. Mannion further unilaterally disclosed to Mr. Brown that GSA's Office of Inspector General had investigated Ms. Brunotte, disclosed that Ms. Brunotte had been criminally charged, and disclosed details of the travel expense allegations against Ms. Brunotte. *See* Exhibit 27 at 2; Exhibit 28 at 1; Exhibit 32 at 34-35; Exhibit 57 (GPO settlement statement) at 1; Exhibit 58 (GPO Close-Out Letter) at 1.  Ms. Brunotte did not consent

43

to GSA's disclosure of her OIG investigative file or the information contained therein to GPO. *See* First Amended Complaint at 15.  Mr. Brown, in his statement in a later investigation and at deposition, testified that Mr. Mannion had told him on November 20, 2006, that Ms. Brunotte was on probation.  *See* Exhibit 28 at 1; Exhibit 32 at 38-39.  GPO in interrogatory responses corroborated that, "During SA Brown's conversation with SA Mannion on November 20, SA Brown understood that Ms. Brunotte was on probation and had a probation officer. *See* Exhibit 57.  Mr. Brown testified that—according to Assistant U.S. Attorney Rosemary Haney--Ms. Brunotte would not have falsified her application if she was on pretrial diversion and not probation. *See* Exhibit 28; Exhibit 58 at 2.  Mr. Brown further testified that, if Mr. Mannion had told him that Ms. Brunotte was on probation, then Mr. Mannion would have given Mr. Brown false information regarding Ms. Brunotte.  *See* Exhibit 32 at 48.  At deposition, Mr. Mannion testified that he told Mr. Brown on November 20, 2006, that Ms. Brunotte was on "probation or pretrial services monitoring" or "[p]robation or some type of monitoring by the Court".  *See* Exhibit 31 at 91-92.  Mr. Mannion further disputed the accuracy of Mr. Brown's statement in the later investigation.  *See id.* at 91-92.  Based on these facts, Plaintiff reasonably infers that an inconsistency exists between Mr. Brown's testimony and Mr. Mannion's testimony as to whether or not Mr. Mannion claimed to Mr. Brown on November 20, 2006, that Ms. Brunotte was on probation, creating a genuine issue of material fact as to whether Mr. Mannion gave Mr. Brown false information that Ms. Brunotte was on probation, an issue of credibility best resolved at trial.

81.     Mr. Mannion did not contemporaneously  the substance of either his November 20, 2006, conversation with Mr. Drugley or his November 21, 2006, conversation with Mr. Brown.  *See* Exhibit 28 at 5; Exhibit 31 at 78-80, 109-10; Exhibit 43.  In a later investigation, Mr. Stewart

stated that, due to the criminal penalties associated with Privacy Act violations, he would presume that an improper disclosure by Mr. Mannion would likely be evidenced by a lack of documentation of the disclosure in the investigative file. *Cf.* Exhibit 42 (GSA OIG ROI Ex. 3) at 2 ("Clearly, if SA Mannion even suspected the release of information was a violation of the Privacy Act, he would not have documented the release in the investigative case file."). While Mr. Mannion noted the fax transmittal of documents to Mr. Brown in the investigative file index, he made no such notation recording his conversations with Mr. Brown or Mr. Drugley. *See* Exhibit 43. Mr. Martinez and Mr. Mannion both testified that notes of contacts can serve an evidentiary purpose, and can be used to refresh recollections of a special agent if they were asked to testify. *See* Exhibit 31 at 74-75; Exhibit 34 at 24. The only excuse offered by Mr. Mannion for not memorializing his verbal disclosures to Mr. Brown at GPO of his allegations of possible falsification by Ms. Brunotte, or his communications with Mr. Drugley, was that he did not think that the communications were a "significant event" and/or "significant activity".[10] *See* Exhibit 31 at 78-80, 109-13. Based on these facts, Plaintiff reasonably infers that Mr. Mannion's decision to not memorialize his conversations with Mr. Drugley and Mr. Brown is indicative of an active intent to hide the substance of those telephonic communications, potentially because those conversations contained information disclosures in violation of the Privacy Act.

82. Mr. Mannion contacted no GPO employee other than Mr. Brown regarding Ms. Brunotte's job application, or regarding his prior investigation into Ms. Brunotte. *See* Exhibit 27

---

[10]     Mr. Mannion further made no separate record in the investigative file index of his February 16, 2006, e-mail to AUSA Wheatley, requesting to place a wire on Mr. Prahm in hopes of securing evidence against Ms. Brunotte, even though the charges against Ms. Brunotte had already been dismissed and a pretrial diversion agreement was pending—although a later e-mail in the correspondence chain did appear in that index. *Compare* Exhibit 43 *to* Exhibit 52.

at 2-3.  Other GSA OIG employees were not in contact with GPO OIG concerning Ms. Brunotte. *See, e.g.,* Exhibit 34 at 80-81.  Mr. Brown was not in contact with anyone at GSA other than Mr. Mannion, and Mr. Brown was the sole active investigator associated with any matters pertaining to Ms. Brunotte at any time in the 2006 timeframe within GPO's Office of Inspector General. *See* Exhibit 28; Exhibit 57; Exhibit 58.  Based on these facts, Ms. Brunotte reasonably infers that the sole communication between GSA and GPO concerning the GSA OIG criminal investigation into Ms. Brunotte was solely between Mr. Mannion and Mr. Brown, and further reasonably infers that any information that GPO possessed concerning the GSA OIG investigation into Ms. Brunotte was solely disclosed to GSA by Mr. Mannion.

83.     At the time that he contacted Mr. Brown, Mr. Mannion possessed no information indicating that Ms. Brunotte had in fact actually falsified any information on her application to work for GPO.  *See* Exhibit 31 at 83, 94-95; Exhibit 32 at 31-33; Exhibit 33 (excerpts of transcript of deposition of Randal Stewart) at 44, 52, 55, 60.  Mr. Mannion admitted that he was purely speculating that Ms. Brunotte would not have disclosed to a future employer that she was under court monitoring or probation.  *See* Exhibit 31 at 93-94.  Mr. Mannion admitted that he had no factual basis for his allegation to Mr. Brown that Ms. Brunotte might have falsified her employment application to GPO or might have withheld information from GPO.  *See* Exhibit 31 at 95, 119.  Indeed, Mr. Mannion admitted that he had not even formed the opinion that Ms. Brunotte had falsified her application to GPO at the time he contacted Mr. Brown.  *See id.* at 97. Mr. Mannion admitted that he did not even know at the time if the information disclosed to him by Mr. Drugley was even true.  *See* Exhibit 31 at 78-79.  At most, Mr. Mannion had "developed the idea that if Rebecca Brunotte had made a false statement on travel vouchers then maybe she

46

also made a false statement on her employment application at GPO", or thought "that Brunotte might do the same thing at GPO that she did at GSA" or that "Ms. Brunotte might engage in the same misconduct at GPO."  *See* Exhibit 26 at 2; Exhibit 27 at 2; Exhibit 29 at 5.  Mr. Stewart admitted that Mr. Mannion's' factual basis for this idea was the belief that if Ms. Brunotte lied once, she would probably lie again—and that Mr. Mannion had never verbalized to Mr. Stewart what his basis was for that belief.  *See* Exhibit 33 at 54-55.  As Mr. Stewart put it, the only information Mr. Mannion had was a hunch based on the prior charges against Ms. Brunotte and the suspicion that Ms. Brunotte would not likely have been able to get a job that particular employer if she had honestly disclosed her recent indictment.  *See* Exhibit 33 at 44.

84.     At the time that he contacted Mr. Brown, Mr. Mannion had not seen Ms. Brunotte's application and possessed no information regarding the specific questions that GPO was asking applicants for the IT Specialist (Customer Support/Policy and Planning) position, and therefore did not have specific information that any questions were asked of Ms. Brunotte that she would have been likely to have falsified.  *Cf.*  Exhibit 31 at 94; Exhibit 33 at 44-45.[11]  Mr. Stewart testified that he would not have made an inquiry to see if Ms. Brunotte's application actually asked for disclosure of past indictments.  *See id.*

85.     Ms. Brunotte's application and her OF-306 form were in written form, and thus in a fixed unalterable form subject to objective analysis.  *See* Exhibit 19; Exhibit 23.  Indeed, the narrative

---

[11]     Mr. Martinez stated that he was "assuming" that the application for the position Ms. Brunotte applied for had some similar questions to an 1811 position, but admitted that "I didn't see that on the application."  *See* Exhibit 34 at 44.  Based on these facts, Plaintiff reasonably infers that Mr. Martinez also did not know what questions were on the application for the position for which Ms. Brunotte applied, and further reasonably infers that Mr. Martinez more specifically did not know whether application for the position for which Ms. Brunotte applied included any questions on whether the applicant was ever the subject of an investigation.

portion of Ms. Brunotte's application (specifically, her resume and KSA essays) was in fixed forms accessible to Defendant, as they were transmitted to GPO through Defendant's e-mail system, and would be archived there.  *See* Exhibit 19 at 1.   The portions of Ms. Brunotte's application which were not sent through GPO's e-mail server would not have pertained to any false statement concerning the criminal proceedings against Ms. Brunotte, as they consisted of records issued by government agencies other than GPO and/or which were readily corroborated by such objective records:  Ms. Brunotte's military discharge record on DD Form 214 issued by the Dept. of the Air Force, a certification of Ms. Brunotte's military disability rating issued by the Dept. of Veterans Affairs, an SF-15 application for veterans preference status (which would be corroborated by the other military records), and an SF-50 form issued by Defendant itself. *See* Exhibit 19.

86.     Mr. Mannion made no attempt to procure a copy of Ms. Brunotte's application from Ms. Brunotte herself or her counsel prior to calling Mr. Brown at GPO, nor did Mr. Mannion ever contact Ms. Brunotte to seek information concerning the substance of her application to work for GPO.    *See* Exhibit 33 at 61; *see also* Exhibit 31 at 83, 94 (Mr. Mannion had never seen Brunotte's application prior to calling Mr. Brown); Exhibit 35.   Mr. Stewart testified that, without possible falsification of Ms. Brunotte's job application to GPO, there would be no business reason for Mr. Mannion to notify GPO that Ms. Brunotte had been investigated for travel issues.  *See* Exhibit 33 at 60.

87.     If Mr. Mannion feared that Ms. Brunotte would not voluntarily give him a copy of her application to work for GPO, his office possessed subpoena power, and so he would have been readily able to procure a copy of Ms. Brunotte's application to work for GPO from Ms. Brunotte

herself or her counsel, had Defendant chosen to do so.  *See* Exhibit 33 at 60.  Similarly, evidence showing that Ms. Brunotte was no longer even in pretrial diversion was available from Ms. Brunotte or her counsel, had Mr. Mannion asked.  *See* Exhibit 54.  Mr. Mannion was not prohibited from seeking a copy Ms. Brunotte's application from Ms. Brunotte herself (through her counsel).  *See* Exhibit 33 at 59-60.

88.     Mr. Mannion did not confer with any of his supervisors in Defendant's Office of Inspector General prior to contacting Mr. Brown at GPO concerning Ms. Brunotte's application to work for GPO.  *See* Exhibit 26 at 1; Exhibit 27 at 2; Exhibit 31 at 95-96; Exhibit 33 at 41; Exhibit 34 (excerpts of transcript of deposition of Floyd Martinez) at 78-79.  In particular, Mr. Mannion admitted that, before he called Mr. Brown, he never checked with his supervisors in Defendant's Office of Inspector General to confirm whether or not he was permitted to tell Mr. Brown that he believed Ms. Brunotte to be on probation.  *See* Exhibit 31 at 95-96.  Mr. Martinez testified that, under the policies of Defendant's Office of Inspector General, a special agent such as Mr. Mannion would be permitted to begin actively investigating a new issues without permission of the supervisory Special Agent in Charge or Assistant Special Agent in Charge— including contacting individuals outside Defendant for information—so long as the case file had not been formally closed and so long as both the initial investigation and the new issue pertained to some form of "employee misconduct."  *See* Exhibit 34 at 19-21, 27-29, 32-33.  In contrast, Mr. Stewart testified that, if the new issue was a substantial violation of a completely different crime, then a special agent would have to bring the new issue to a Special Agent in Charge or Assistant Special Agent in Charge before being permitted to investigate.  *See* Exhibit 33 at 19-20.  Mr. Stewart further testified that a rookie special agent would ordinarily held less discretion

to unilaterally begin investigations on a new claim where the prosecution on the original claim had been dismissed, and that instead a higher degree of participation with senior agents would have been required.  *See id.* at 22-24.

89.    After Mr. Mannion alleged to Mr. Brown that Ms. Brunotte was on probation, Mr. Brown then asked to see a copy of the GSA OIG investigative file on Ms. Brunotte  *See* Exhibit 28 at 1; Exhibit 31 at 115-16.  Based on these facts, and on the fact that no memorialization was made by either Mr. Mannion or Mr. Brown of their conversation, Plaintiff reasonably infers that Mr. Brown's request to Mr. Mannion to see a copy of the GSA OIG investigative file on Ms. Brunotte was not made in writing.

90.    Mr. Mannion initiated the call to Mr. Brown *See* Exhibit 28 at 1; Exhibit 31 at 116; Exhibit 32 at 70; Exhibit 58 (GPO close-out letter).  Mr. Brown testified that GPO's Office of Inspector General had no jurisdiction over acts committed by Ms. Brunotte while she was still at GSA. *See* Exhibit 32 at 70-71.  Mr. Brown further stated that the first information he received from Mr. Mannion concerning any possible criminal conduct by Ms. Brunotte was not in response to any request from him, and that GPO's Office of Inspector General was in possession of no information concerning possible criminal violations by Ms. Brunotte prior to the Mr. Mannion's call to Mr. Brown on November 20, 2006.  *See id.* at 71; Exhibit 28 at 1.

91.    Prior to Mannion's call, neither Mr. Brown nor GPO had any active investigation going on Brunotte whatsoever, and only opened a developmental investigation after receiving GSA's disclosure of documents from Mr. Mannion's investigation into Ms. Brunotte.  *See* Exhibit 28 at 1; Exhibit 32 at 66, 69.  Indeed, Mr. Brown's own report concerning GPO's investigation into Ms. Brunotte only started with Mr. Mannion's telephone call to Mr. Brown on November 20,

2006.  *See* Exhibit 32 at 8-9, 66; Exhibit 58.  Prior to Mr. Mannion's call on November 20, 2006,

Mr. Brown had never told Mr. Mannion that he was investigating whether Ms. Brunotte had

violated the law by making a false statement.  *See* Exhibit 32 at 71-72.  Mr. Mannion admitted

that he had no reason to suspect that Ms. Brunotte was under investigation at GPO.  *See* Exhibit

31 at 108.

92.     Mr. Stewart testified that Mr. Mannion had informed him, at or around the time of the

proposed disclosure to GPO in November 2006, that no finalized pretrial diversion agreement

had been concluded for Ms. Brunotte.  *See* Exhibit 33 at 36-37, 40-41, 49.  Mr. Mannion

received a full copy of Ms. Brunotte's pretrial diversion agreement on June 27, 2006, and

notified Mr. Stewart of this pretrial diversion agreement on or around June 30, 2006, as

documented by a memorandum of activity signed by both Mr. Mannion and Mr. Martinez.  *See*

Exhibit 29 at 10; Exhibit 33 at 78.  Mr. Stewart testified that it would not be permissible for one

of his special agents to lie to him, such as by falsifying the reasons for contacting or providing

information to another law enforcement agency.  *See* Exhibit 33 at 39-40.  Based on these facts,

Plaintiff reasonably infers that a genuine issue exists as to the material fact of whether or not Mr.

Mannion lied to Mr. Stewart as to whether or not Ms. Brunotte was on pretrial diversion, an issue

of credibility requiring a trial to resolve.

93.     Mr. Mannion claimed to his supervisors that a joint investigation was pending between

GSA and GPO, and asked for permission to release the investigative files regarding Ms. Brunotte

to GPO.  *See* Exhibit 26 at 2.  Mr. Mannion said his sense was that a joint investigation occurred

just somehow arose from working with another agency on an investigation, and he claimed he

believed he was working a joint case at the time.  *See* Exhibit 31 at 98, 101. However, Mr.

Mannion admitted that he couldn't recall discussing with Mr. Brown whether this would be a joint case.  *See id.* at 98.   Mr. Brown did not recall ever specifically saying that he was engaging in a joint investigation. *See* Exhibit 32 at 55.   Indeed, Mr. Brown admitted that he lacked the authority to enter into a joint investigation with another federal agency, that any such joint investigation could only be approved by his supervisors.  *See id.*  Mr. Brown further testified that he did not recall his supervisors ever approving a joint investigation, that he only had done 2-3 joint investigations over a six-year period, and so he likely would have remembered if his supervisors had authorized a joint investigation concerning Ms. Brunotte.  *See id.* at 55-58. Based on these facts, Plaintiff reasonably infers that no joint investigation existed between GPO and GSA concerning Ms. Brunotte.  Plaintiff further reasonably infers that a genuine issue of material fact exists as to whether Mr. Mannion misrepresented to his managers that a joint investigation with GPO existed, an issue of credibility requiring a trial to resolve.

94.     Mr. Mannion and Mr. Stewart decided to release portions of the investigative file to Mr. Brown at GPO—but specifically decided to omit Ms. Brunotte's pretrial diversion agreement itself.  *See* Exhibit 26 at 1; Exhibit 29; .Exhibit 33 at 74-75.  Mr. Stewart claimed that the reason that the pretrial diversion agreement could not be disclosed to GPO was that it was unsigned and therefore not in the public record.  *See* Exhibit 33 at 74-75.  However, the pretrial diversion agreement had in fact been signed by that time.  *See* Exhibit 29 at 10; Exhibit 33 at 77-79; Exhibit 53.  Mr. Stewart testified that, even if the pretrial diversion agreement had been signed, the specific terms of the agreement would dictate whether or not it could be permissibly disclosed by GSA to GPO.  *See* Exhibit 33 at 75-76.  However, Mr. Stewart admitted that he did not recall discussing the specific terms of the pretrial diversion agreement with Mr. Mannion

during their deliberations on whether to release the pretrial diversion agreement to GPO.  *See id.*

at 76.   Mr. Martinez testified that, ordinarily, the way one would determine if an individual in

pretrial diversion was on probation would be to see if "probation" was expressly listed in the

pretrial diversion agreement.  *See* Exhibit 34 at 89-90.  Mr. Brown testified that, if Mr. Mannion

had told him that Ms. Brunotte was probation, then Mr. Mannion would have given him false

information.  *See* Exhibit 32 at 48.  Mr. Stewart testified that, hypothetically, if Mr. Mannion was

aware that Ms. Brunotte had a pretrial diversion agreement which did not contain a probation

clause, and if Mr. Mannion then represented to GPO that Ms. Brunotte was on probation, then

Mr. Mannion would have made a false or inaccurate representation to GPO.  *See* Exhibit 33 at

69-70.  Mr. Stewart further testified that he would not want his agents to use false pretenses to

contact other law enforcement agents.  *See id.* at 70.  Mr. Brown, in his statement in a later

investigation and at deposition, testified that Mr. Mannion had told him on November 20, 2006,

that Ms. Brunotte was on probation.  *See* Exhibit 28 at 1; Exhibit 32 at 38-39.  Mr. Stewart

testified that Mr. Mannion had informed him, at or around the time of the proposed disclosure to

GPO in November 2006, that no finalized pretrial diversion agreement had been concluded for

Ms. Brunotte.  *See* Exhibit 33 at 36-37, 40-41, 49.  Based on these facts, and the fact that Mr.

Mannion had represented to Mr. Brown that Ms. Brunotte was on probation before he met with

Mr. Stewart to discuss possibly releasing the GSA investigative file on Ms. Brunotte to GPO

without the pretrial diversion agreement, the text of which would clearly indicate that Ms.

Brunotte was not on probation, Plaintiff reasonably infers that a genuine issue of material fact

exists as to whether Mr. Mannion lied to Mr. Stewart in order to have the pretrial diversion

agreement not sent to GPO, in furtherance of an attempt by Mr. Mannion to mislead GPO into

believing that Ms. Brunotte was on probation, creating issues of credibility requiring a trial to resolve.

95.     Mr. Mannion faxed the OIG investigative file on Ms. Brunotte (omitting the pretrial diversion agreement) on November 21, 2006.  *See, e.g.,* Exhibit 27 at 2; Exhibit 28 at 1; Exhibit 29; Exhibit 32 at 60.     The documents Mr. Mannion faxed to Mr. Brown were expressly identified as being covered by the GSA/ADM-24 Privacy Act system of records.  *See* Exhibit 16 at 6**;** Exhibit 29 at 2.   Further, the materials Mr. Mannion faxed to Mr. Brown were either "Investigative files containing personal information, including name, date and place of birth, experience, and investigative material." or "Investigative files containing information such as name, date and place of birth, experience, and investigative material that is used as a basis for taking civil, criminal, and administrative actions.", and thus were subject to the GSA/ADM-24 and/or GSA/ADM-25 Privacy Act systems of records.  *See* Exhibit 36 (relevant Privacy Act system of records notices), 69 Fed.Reg. 78,034 (December 29, 2004); 68 Fed.Reg. 16,799 (April 7, 2003).

96.     On November 27, 2006, Mr. Brown contacted Assistant U.S. Attorney Rosemary Haney regarding two—and only two—statements in Ms. Brunotte's entire application and set of pre-employment submissions to GPO, specifically two questions on Ms. Brunotte's OF-306 form (which was part of the pre-employment paperwork rather than the application).  *See* Exhibit 22; Exhibit 25; Exhibit 32 at 50-51; Exhibit 57, Exhibit 58.   Mr. Brown was not asking AUSA Haney to prosecute; he was merely requesting her clarification on the relevant issues.  *See* Exhibit 28 at 2; Exhibit 32 at 78-79.   After reviewing the forms, AUSA Haney advised Mr. Brown that Ms. Brunotte had not falsified her response to the question concerning probation, in

54

that Ms. Brunotte's pretrial diversion did not constitute her being on probation.  *See* Exhibit 32 at

44-46, 48, 79-80; Exhibit 57, Exhibit 58.  AUSA Haney further noted that she was unsure if Ms.

Brunotte's response to the question on whether Ms. Brunotte had inaccurately answered the

question concerning whether Ms. Brunotte had left a prior employer by mutual agreement

because of specific problems; AUSA Haney opined that the issue could require further

investigation to see if any violation had in fact occurred.  *See id.*  In fact, Ms. Brunotte had not

falsified the OF-306 form, in that she had signed and filed the form prior to receiving the notice

of proposed removal from Ms. Coleman.  *Compare* Exhibit 20 at 4; Exhibit 22; Exhibit 23 *to*

Exhibit 55.  Mr. Brown reported his conversation with ASUA Haney to GPO management

through his supervisor, Ronald Koch, and was informed that GPO's Office of General Counsel

and Human Capital office would handle the matter.  *See* Exhibit 57, Exhibit 58.  GPO's Office of

Inspector General then notified GPO General Counsel Greg Brower of information received

regarding Ms. Brunotte, and provided Mr. Brower with a copy of the GSA OIG investigative

documents Mr. Mannion produced to Mr. Brown.  *See* Exhibit 57.

97.     Mr. Brown testified that he was not asking AUSA Haney to prosecute when he contacted

her; he was merely requesting her clarification on the relevant issues.  *See* Exhibit 28 at 2.  In

contrast, Mr. Mannion testified that Mr. Brown had told Mr. Mannion that the purpose of Mr.

Brown contacting AUSA Haney was to request on behalf of GPO that charges be pressed against

Ms Brunotte.  *See* Exhibit 27 at 3.   Based on these facts, Plaintiff reasonably infers that an

inconsistency exists between Mr. Brown's testimony and Mr. Mannion's testimony as to the

purpose of Mr. Brown's contact with AUSA Haney and as to GPO's perception of the strength

of Mr. Mannion's allegations against Ms. Brunotte concerning her application, creating a

genuine issue of material fact based on witness credibility best resolved at trial.  Mr. Mannion claimed to Mr. Stewart that AUSA Haney had opined that Ms. Brunotte had definitely made a material false statement on her application, but that it was *de minimis.*  *See* Exhibit 33 at 47-48, 49-50. However, Mr. Mannion was not even present at the meeting between AUSA Haney and Mr. Brown.  *See* Exhibit 32 at 43-44, 65.  Based on these facts, and the fact that AUSA Haney had actually stated was actually unsure if Ms. Brunotte's responses on her application was inaccurate (perhaps requiring additional investigation), Plaintiff reasonably infers that Mr. Mannion was providing inaccurate information to Mr. Stewart regarding the status of proceedings concerning Ms. Brunotte in relation to her application to work for GPO, raising genuine issues as Mr. Mannion's credibility which require a trial to resolve.

98.     At the time she applied to work for GPO, Ms. Brunotte was an IT manager working for GSA and not GPO.  *See* Exhibit 3 at 60; Exhibit 19; Exhibit 20 at 1-2.  Ms. Brunotte was also applying for an IT manager position at GPO.  *See* Exhibit 19; Exhibit 20 at 2; Exhibit 25.  On November 20-21, 2011, Ms. Brunotte was still an employee of GSA.  *See* Exhibit 20 at 6-7, 10. Thus, as Ms. Brunotte was neither a current GPO employee nor in a position with coercive authority (such as law enforcement or an IRS auditor), she was not in any position to coerce GPO to hide any falsifications she may have allegedly made to her application to work for GPO.

99.     After contacting Mr. Brown in November 2006 regarding Ms. Brunotte's application to work for GPO, Mr. Mannion never subsequently made any attempt to procure a copy of Ms. Brunotte's application from Ms. Brunotte herself or her counsel prior to calling Mr. Brown at GPO, nor did Mr. Mannion ever subsequently contact Ms. Brunotte to seek information concerning the substance of her application to work for GPO.  *See* Exhibit 35.

56

100.    On December 11, 2006, Ms. Brunotte received notice that GPO had withdrawn its offer of employment with GPO.  *See* Exhibit 20 at 11; Exhibit 24 (GSA withdrawal of its job offer to Ms. Brunotte).

101.    Plaintiff subsequently appealed GPO's withdrawal of its job offer to the Merit Systems Protection Board, a case which was later settled.  *See* Exhibit 57.   Under the terms of the settlement agreement for that litigation, GPO agreed to provide a statement of certain relevant facts concerning the withdrawal of its job offer to Ms. Brunotte.  *See id.*  In that statement, GPO stated that information Mr. Mannion disclosed to Mr. Brown was the sole reason for its withdrawal of its job offer to Ms. Brunotte:  "Mr. Reynold Schweickhardt, GPO Chief Information Officer, made the decision to withdraw the offer of employment to Ms. Brunotte. Mr. Schweickhardt's decision was based on the information provided to the GPO Office of Inspector General (OIG) by the GSA's OIG."  *See id.; accord* Exhibit 40 at 48.   Mr. Schweickhardt was specifically contacted by GPO's chief of human capital, Bill Harris, who related to him information received by GPO's Inspector General from GSA's Office of Inspector General; Mr. Brown indicated that Mr. Harris received the information from him through one of Mr. Brown then-supervisors, GPO Assistant Inspector General Ronald Koch.  *See* Exhibit 32 at 10, 47; Exhibit 40 at 29-33, 46.   The sole concerns Mr. Harris related to Mr. Schweickhardt concerning Ms. Brunotte were derived from the information received from GSA's Office of Inspector General.  *See* Exhibit 40 at 33.  Mr.. Schweickhardt did not have any direct contact with anyone at GSA concerning Ms. Brunotte, and did not recall having any contact with Mr. Brown concerning Ms. Brunotte.  *See id.* at 44, 47.  Mr. Brown testified that he never discussed Ms. Brunotte's application or her potential employment by GPO with Mr. Schweickhardt.  *See*

Exhibit 32 at 72-73.   In testimony, Mr. Schweickhardt confirmed that he was the one who decided to withdraw the job offer from Ms. Brunotte, and that his decision was based solely on the information GPO received from GSA's Office of Inspector General.  *See* Exhibit 40 at 34-35, 37, 48.  Mr. Schweickhardt further testified that he was never notified of any investigation by GPO into Ms. Brunotte.  *See id.* at 52.

102.    Mr. Schweickhardt testified that GPO had been notified of the existence of Ms. Brunotte's settlement agreement with GSA, and that Mr. Harris—GPO's chief of human capital—was of the opinion that GSA's Office of Inspector General didn't believe it was covered by the settlement agreement.  *See* Exhibit 40 at 38-39. Mr. Mannion testified that he was aware of the settlement agreement between Ms. Brunotte and GSA, but could not recall exactly when he learned of the settlement.  *See* Exhibit 31 at 81-82. Mr. Brown testified that he could not recall if he was notified of a settlement agreement between Ms. Brunotte and GSA.  *See* Exhibit 32 at 69.  Based on these facts, on the fact that all of the negative information reviewed by Mr. Schweickhardt concerning Ms. Brunotte came through disclosures directed through GSA's Office of Inspector General, on the fact that the only direct contact between GSA OIG and GPO was through Mr. Mannion, and on the fact that Mr. Mannion's sole contact with GPO's Office of Inspector General was through Mr. Brown, Plaintiff reasonably infers that Mr. Mannion disclosed the existence and terms of Ms. Brunotte's settlement agreement with GSA to Mr. Brown.   Based on these facts and inferences, and on the fact that Ms. Brunotte's settlement agreement contained a neutral reference clause, Plaintiff reasonably infers that Mr. Mannion made the disclosure to GPO knowing that his disclosure was contrary to the terms of the settlement agreement.   Mr. Stewart testified that he was not notified of the existence of a

settlement agreement between GSA and Ms. Brunotte until December 2006.   or January 2007. *See* Exhibit 33 at 66-67.  Based on these facts and inferences, and on the fact that Mr. Mannion did not confer with his supervisors within GSA's Office of Inspector General prior to contacting GPO's Office of Inspector General, Plaintiff reasonably infers that Mr. Mannion made no attempt to assess if GSA's Office of Inspector General was permitted to disclose the existence and terms of Ms. Brunotte's settlement agreement with GSA to GPO prior to disclosing the settlement agreement to Mr. Brown at GPO's Office of Inspector General.

103.   When GSA counsel Roland Ben learned of Mannion's disclosure, Mr. Ben was sufficiently upset that he stopped talking to Mr. Mannion and notified GSA OIG management that he was upset with Mr. Mannion.   Exhibit 27 at 1; Exhibit 39 at 66-67 (transcript of first Ben deposition).

104.   At the time of Mr. Mannion's disclosure to Mr. Brown, Mr. Stewart had roughly 24 years of experience in law enforcement, at least 15 years of which was in federal law enforcement. *See* Exhibit 33 at 13-14.   In a later investigation, Mr. Stewart stated that his operative understanding of the Privacy Act was that 5 U.S.C. § 552a(j)(2) exempted communications between law enforcement organizations from the effects of the Privacy Act.  *See* Exhibit 26 at 1; Exhibit 42 at 2.  Based on these facts, the plain text of 5 U.S.C. § 552a(j)(2) (which excluded subsection "b"—the disclosure rules—from the scope of the 5 U.S.C. § 552a(j)(2) exemption), and the fact that Mr. Stewart was aware of the specific citation for 5 U.S.C. § 552a(j)(2), Plaintiff reasonably infers that Mr. Stewart was acting with reckless disregard for the actual terms of the

Privacy Act with regards to what disclosures were permitted from GSA's Office of Inspector General to other law enforcement bodies.[12]

105.    Mr. Martinez testified that, in his understanding, it would be appropriate under the Privacy Act for Mr. Mannion to have used the law enforcement to law enforcement exemption in the Privacy Act to contact GPO in hopes that by giving information to GPO, GPO would then decide not to hire Ms. Brunotte—even if Ms. Brunotte had done nothing illegal in her employment application.  *See* Exhibit 34 at 57-58.  Mr. Martinez' knowledge of the law enforcement to law enforcement routine use derived from information he received from Mr. Stewart in discussions concerning the faxing of information on Ms. Brunotte to GPO. *See* Exhibit 34 at 63-64.  Mr. Martinez testified that, in his understanding, it would be appropriate to use the law enforcement to law enforcement exemption  to notify another agency (through its office of inspector general), as a 'head's up' that an investigation was pending against an individual, just because that individual was applying for a job at the recipient of the disclosure. *See* Exhibit 34 at 43-44.  Mr. Martinez stated that this was because the two inspector general's offices were "protecting the government".  *See id.* at 43.  In Mr. Martinez' understanding, the motivation for a disclosure does not matter, so long at both agencies have the same person of interest and the disclosure is law enforcement to law enforcement.  *See* Exhibit 34 at 61-62.

106.    Mr. Stewart testified that he thought GSA Office of Inspector General was free to contact potential subsequent employers to determine if a particular employee had falsified their

---

[12]      Although Mr. Stewart claimed that new agents received Privacy Act training as part of their rookie agent training at the Federal Law Enforcement Training Center and that all agent sat GSA's Office of Inspector General received annual Privacy Act training, he admitted that he was unaware of the requirement under 5 U.S.C. § 552a(e)(2) for information to be collected from the subject to the maximum extent possible.  *See* Exhibit 33 at 23, 25-26.

application, if the employee had been previously alleged to have falsified any document and if the GSA Office of Inspector General still deemed the investigation open.  *See* Exhibit 33 at 45-46.  Mr. Stewart cited the mere fact that Ms. Brunotte had applied for a job with GPO as Mr. Mannion's evidence that Ms. Brunotte continuing or further falsifying documents.[13]  *See id.* at 46.

107.    Mr. Mannion admitted that his understanding of the Privacy Act was that it involved a law enforcement exemption, and his understanding of the law enforcement exemption was that law enforcement officers were allowed to share information with other law enforcement officers without any restrictions whatsoever that he was aware of.  *See* Exhibit 31 at 25-28.  Mr. Mannion claimed that this understanding came either from training or from having been instilled from his time working at GSA's Office of Inspector General.  *See id.*

108.    The loss of the GPO job caused by Mr. Mannion's communications with GPO left Ms. Brunotte unable to find further work despite her active attempts to do so.  *See, e.g.,* Exhibit 16 at 9-15, 17-20.   The loss of the GPO job caused by Mr. Mannion's actions psychologically traumatized Ms. Brunotte to the extent that she ultimately became unable to seek further employment, and further caused her extreme psychological anguish, emotional pain and suffering.  *See id.*; Exhibit 45 (report of Kevin D. Arnold, Ph.D.). In addition to lost past and future salary Ms. Brunotte further suffered financial losses caused by the need-based disadvantageous sale of assets caused by Mr. Mannion's communications with GPO, which left Ms. Brunotte without salary income.  *See* Exhibit 16 at 15; Exhibit 46 (Report of Amy

---

[13]    Mr. Mannion cited the fact that Ms. Brunotte was leaving GSA for GPO and the fact that she had been charged for other fraudulent behavior as his basis for believing that Ms. Brunotte was liable to make false statement on her application to GPO.  *See* Exhibit 31 at 105-06

McCarthy, Ph.D.).    Ms. Brunotte incurred pecuniary expenses in the treatment of these

conditions, including out-of-pocket expenses for mileage traveling to and from treatment at VA

(travel to the VA clinic in Akron, OH where Ms. Brunotte's psychotherapists was roughly 9

miles each way when she was living in Akron, OH, roughly 120 miles each way when she was

living Natrona Heights, PA, and is roughly 120 miles each way, and is roughly 80 miles each

way from Ms. Brunotte's present residence in New Castle, PA.  *See* Exhibit 60.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ Joseph V. Kaplan

_____

JOSEPH V. KAPLAN
D.C. BAR # 347344
ANDREW J. PERLMUTTER
D.C. BAR # 489601
PASSMAN & KAPLAN, P.C.
1828 L Street NW, Suite 600
Washington, D.C. 20036
(202) 789-0100

Attorneys for the Plaintiff

</div>